**James H. ADAMS, et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 55–89C.**

United States Claims Court.

April 12, 1990.

Michael P. Guta, San Francisco, Cal., for plaintiffs.

Terrence S. Hartman, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

The 66 named plaintiffs allege that the Central Intelligence Agency (the CIA) took their private property for public use. Plaintiffs delivered money to an investment banking firm purportedly operated or maintained by the CIA. Thus, plaintiffs contend that the CIA used their money to fund intelligence activities. According to plaintiffs, negligent operation or supervision of the investment firm by the CIA proximately caused the firm's insolvency and the consequent loss of plaintiffs' investments.

Defendant now moves for summary judgment. Specifically, defendant contends that this court lacks jurisdiction because plaintiffs' complaint sounds in tort. In the alternative, defendant argues that plaintiffs' complaint does not state a takings claim. Defendant contends that plaintiff does not allege lawful Government action, a prerequisite for just compensation under the fifth amendment to the United States Constitution.

This court dismisses plaintiffs' complaint for lack of jurisdiction. Plaintiffs' complaint also fails to state a compensable claim.

## FACTS [1]

On October 11, 1978, Ronald Rewald and Sunlin Wong incorporated the investment banking firm of Bishop, Baldwin, Rewald, Dillingham, and Wong (Bishop, Baldwin) in Honolulu, Hawaii. At the request of the CIA, Rewald formed Bishop, Baldwin either to finance intelligence operations through the use of customers' money or to serve as a cover for intelligence activities.[2]

Rewald and Wong each held fifty percent of the firm's stock. Rewald served as chairman of the board, vice president, and treasurer. Wong was vice president and served as a director.

Bishop, Baldwin represented itself as one of Hawaii's oldest and largest investment firms. The firm purported to deal only in non-risk investments. Bishop, Baldwin claimed that the Federal Deposit Insurance Corporation guaranteed a customer's account up to $150,000.00. Further, the firm's literature guaranteed investors a minimum return of twenty percent on their investments.

Between 1978 and 1983, Bishop, Baldwin received more than $20 million from investors. Plaintiffs collectively purchased over $5 million in investment contract securities from the firm. Plaintiffs' investments ranged from $3,500.00 to $2,189,227.22.

On August 4, 1983, five creditors of Bishop, Baldwin filed a petition for involuntary bankruptcy in federal district court against the firm. *Matter of Bishop, Baldwin, Rewald, Dillingham & Wong*, 779 F.2d 471 (9th Cir.1985). The creditors alleged that the firm had not paid its debts. Conse-

quently, on August 5, the trustee in bankruptcy appointed by the court filed a complaint against Rewald. The trustee sought to impose a constructive trust on all of Rewald's assets. The trustee contended that Rewald acquired those assets by misappropriating Bishop, Baldwin funds.

On August 8, 1983, state authorities arrested Rewald for theft by deception. On the same date, the Securities and Exchange Commission (SEC) filed suit against Rewald in federal district court. The SEC sought to enjoin Rewald from dissipating Bishop, Baldwin assets. The district court granted the SEC's motion.

After hearing arguments on August 15 and 16, 1983, the district court conducting the bankruptcy proceedings enjoined Rewald from disposing of any of his assets. The court found that Rewald and Wong operated a "Ponzi Scheme" where Bishop, Baldwin met their obligations to earlier investors with new investors' funds. This scheme, of course, only appears to work as long as the investor pool grows. The district court subsequently granted summary judgment for the creditors and the trustee in bankruptcy. *Id.*

On August 30, 1984, The United States Attorney's office in Hawaii filed a 100-count indictment against Rewald. Among other things, the Grand Jury charged Rewald with mail fraud, 18 U.S.C. § 1341 (1988), securities fraud, 15 U.S.C. § 77q(a) (1988), and fraud by an investment adviser, 15 U.S.C. § 80b-6 (1988). After an eleven-week criminal trial in 1985, a jury convicted Rewald of 94 of the indictment's 98 counts. On December 10, 1985, the district court

---

1. The court may examine documents outside of the pleadings to ascertain the basis for jurisdiction:

   Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that *the following defenses may* at the option of the pleader *be made by motion:* (1) *lack of jurisdiction over the subject matter* .... *If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert* at the trial *any defense in* law or *fact* to that claim for relief.

   RUSCC 12(b) (emphasis added). *See Pinkston v. United States*, 6 Cl.Ct. 263, 265 (1984).

2. In evaluating this motion, this court construes the facts in a light most favorable to plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Thus, for purposes of this motion only, the court assumes that the CIA operated or supervised Bishop, Baldwin as part of its intelligence activities. The court also assumes at different times varying facts. Because plaintiffs have not enjoyed full discovery—due to both the sensitivity of CIA documents and the early filing of this motion by defendant—this court examines plaintiffs' varying factual scenarios to ascertain whether there is a claim cognizable in the Claims Court.

sentenced Rewald to 80 years in prison. Wong pled guilty to multiple criminal violations.

On January 31, 1989, plaintiffs filed this action in the United States Claims Court. Plaintiffs allege that the CIA negligently operated or supervised Bishop, Baldwin. According to plaintiffs, the CIA's negligent actions constituted a taking of private property without just compensation in violation of the fifth amendment to the United States Constitution.

Defendant moved for summary judgment. Defendant's motion, however, in fact asks this court to dismiss this case for lack of jurisdiction or for failure to state a claim.

This court held oral argument on defendant's motion on March 29, 1990. After hearing oral argument, this court concluded that plaintiffs could not prove any set of facts that would show a claim cognizable in the Claims Court. Thus, this court dismisses plaintiffs' complaint.

## DISCUSSION

When evaluating motions to dismiss—either for lack of subject matter jurisdiction or for failure to state a claim upon which relief can be granted—this court must accept the allegations made by plaintiff as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1976) (subject matter jurisdiction); *Featheringill v. United States,* 217 Ct.Cl. 24, 26 (1978) (failure to state a claim). This court considered separately each of plaintiffs' allegations.

At oral argument, plaintiffs' counsel set forth three possible scenarios which could entitle plaintiffs to relief. First, the CIA negligently supervised the activities of Bishop, Baldwin. Specifically, the CIA negligently hired and failed to supervise managers with criminal propensities. Under the second scenario, the CIA used Bishop, Baldwin to obtain funds for use in intelligence operations. Under the final scenario, the CIA created the investment firm as a cover and plaintiffs lost investments due to a natural downturn of the market.

None of these scenarios, however, give rise to a claim cognizable in the Claims Court. In the first scenario, the Claims Court has no jurisdiction to adjudicate negligence actions. For different reasons, both the second and third scenarios do not state a takings claim under the fifth amendment. Because none of plaintiffs' possible scenarios give rise to an action cognizable in the Claims Court, this court must dismiss plaintiffs' complaint.

### Negligence: Lack of Jurisdiction

■ Under plaintiffs' first scenario supporting recovery, this court assumed that the CIA breached a duty of care by negligently hiring Bishop, Baldwin management and by negligently failing to supervise the firm's operations. This court could construe plaintiffs' allegations to mean that the CIA instructed Rewald to form an investment firm as a cover for intelligence operations. Rewald, as a CIA agent, then mismanaged the firm, causing the loss of customers' investments. Plaintiffs allege, therefore, that the CIA negligently permitted Rewald to furnish investors with incorrect information. This inaccurate information caused plaintiffs' economic losses.

Alternatively, plaintiff can allege that the CIA itself mismanaged the firm. Plaintiffs can allege that the CIA itself negligently supplied incorrect or incomplete investment advice. In sum, the CIA's negligence allegedly caused plaintiffs' losses. The Claims Court, however, has no jurisdiction to adjudicate any of these various negligence actions.

The Tucker Act confers important jurisdiction on the United States Claims Court:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1982). The Claims Court may not entertain claims outside this specific jurisdictional authority. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1956); *Tree Farm Dev. Bank v. United States*, 218 Ct.Cl. 308, 316, 585 F.2d 493, 498 (1978). Thus, as the language of the Tucker Act explicitly states, the Claims Court may not decide claims that sound in tort. 28 U.S.C. § 1491(a)(1); *see also, Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 743, 508 F.2d 817, 820 (1974).

Tort claims include negligent misrepresentation, wrongful inducement, or careless performance of a duty. *Somali*, 508 F.2d at 821. The fact that plaintiffs do not label their claim as one sounding in tort is irrelevant. This court is not bound by labels selected by the parties to characterize their action. *Mason v. United States*, 222 Ct.Cl. 436, 442, 615 F.2d 1343, 1345–46 (1980).

Plaintiffs' complaint states:

> At all times herein alleged, Respondent USA intentionally through the CIA maintained, controlled, ran, operated, provided, funded, counselled, and managed the investment firm of Bishop, Baldwin, Rewald, Dillingham & Wong, Incorporated.
>
> At all times herein alleged, Respondent USA used Petitioners investment funds for the Central Intelligence Agencie's [sic] intelligence activities. Respondent USA so *negligently* maintained, controlled, ran, operated, supervised, funded, counselled and managed the investment firm of BBRD & W, Inc., so as to cause BBRD & W adjudicated as bankrupt in August, 1983, thereby actually and proximately causing Petitioners' damages as herein alleged.

Complaint, No. 55–89C, filed Jan. 31, 1989 (Complaint), at ¶¶ 39–40 (emphasis added).

This court lacks jurisdiction over plaintiffs' complaint to the extent it asserts tort claims. *Aetna Casualty & Surety Co. v. United States*, 228 Ct.Cl. 146, 164, 655 F.2d 1047, 1059 (1981); *Somali*, 508 F.2d at 821. The gravamen of plaintiffs' claim is that the Government, or its agent Rewald, carelessly performed the duty to operate and supervise Bishop, Baldwin in a prudent and responsible manner. Plaintiffs' characterization of this careless performance as a taking under the fifth amendment does not otherwise give this court jurisdiction.[3]

To support their argument that this court has jurisdiction, plaintiffs have cited the Ninth Circuit's opinion in *Frigard v. United States*, 862 F.2d 201 (9th Cir.1988). In *Frigard*, one of the plaintiffs in this case earlier sought relief under the Federal Tort Claims Act. The Ninth Circuit dismissed the action for two reasons. First, the complaint stated a cause of action for misrepresentation, which is not compensable under the Tort Claims Act. Second, even if the complaint properly stated a claim for negligence, the Frigards would not have a cause of action because the CIA's conduct involved a policy judgment, which is not reviewable under the discretionary function exception to the Tort Claims Act. According to plaintiffs, this ruling by the Ninth Circuit shows that their claim cannot sound in tort, but instead involves a policy decision to appropriate private property.

To the contrary, the Ninth Circuit did not say that the claim now before this court involves a taking rather than a tort. Rather, the Ninth Circuit stated that the Frigard action fell within non-compensable exceptions to the Federal Tort Claims Act. Thus, the tort alleged by the Frigards, according to the Ninth Circuit, was not compensable under the Tort Claims Act.[4]

---

**3.** At oral argument, plaintiffs similarly suggested that they may have lost their investments because the CIA hired individuals with criminal propensities. Such an allegation attacks the prudence and competence of CIA supervision or management. As such these allegations also sound in tort.

**4.** In the Ninth Circuit, plaintiffs claimed damages for the tort of misrepresentation. The

Ninth Circuit suggested that the Frigands could recast their complaint to state another federal tort:

> The *Frigards* could reframe their claims to exclude the misinformation and reliance elements, and thereby avoid the bar of the misrepresentation exception. See, *Block v. Neil*, 460 U.S. 289, 297–98, 103 S.Ct. 1089, 1093–94, 75 L.Ed.2d 67 (1983). However, we would

The Ninth Circuit did not conclude that plaintiffs' claim is a non-tortious taking actionable in the Claims Court.

In any event, the Ninth Circuit's findings of jurisdictional facts pertain only to the case before it and do not impair an independent jurisdictional determination by this court. *See Stevedoring Servs. of Am. v. Ancora Transp.*, 884 F.2d 1250, 1252 (9th Cir.1989); *United States Dept. of Energy v. West Texas Mktg. Corp.*, 763 F.2d 1411, 1420 (Temp.Emerg.Ct.App.1985) (Christensen, *J.*, concurring). This court cannot escape the language of plaintiffs' complaint invoking tort remedies. The Tucker Act forecloses this court's power to adjudicate such claims.

In sum, then, plaintiffs' complaint states a cause of action that sounds in tort. Under the Tucker Act, the Claims Court lacks jurisdiction over cases "sounding in tort." 28 U.S.C. § 1491(a)(1). Consequently, this court must dismiss plaintiffs' complaint pursuant to RUSCC 12(b)(1) for lack of subject matter jurisdiction.

### *Failure to State a Claim* [5]

Even if plaintiffs successfully demonstrated that this court has jurisdiction over their complaint, they would not prevail against defendant's motion. Defendant also has shown that plaintiffs fail to state a claim on which this court may grant relief. RUSCC 12(b)(4). Specifically, plaintiffs have not and cannot allege all the facts necessary to set forth a takings claim under the fifth amendment.

RUSCC 12(b)(4) authorizes the Claims Court to dismiss a complaint for failure to state a claim. This court's review in the context of a RUSCC 12(b)(4) motion has distinct limits:

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

*Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Under this standard, this court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. This court therefore will dismiss only if plaintiffs fail to allege facts for each requisite element of their takings claim or admit facts extinguishing their cause of action.

Plaintiffs' complaint alleges that the Government "used petitioners investment funds for the Central Intelligence Agency's intelligence activities." Complaint, at ¶ 40. This allegation is susceptible to two possible interpretations.[6] Plaintiffs could contend that the CIA converted plaintiffs' funds into intelligence activity revenues. This allegation is plaintiffs' second possible scenario.

Plaintiffs' complaint also suggests a third scenario. Under this reading, the CIA merely used the firm as an intelligence cover, but did not convert customer funds. Acceptance of investments from customers was necessary to maintain this cover. The loss of such investments due to fluctuations in the market was a foreseeable result of the CIA's cover operation.

---

also lack jurisdiction to hear such an action for simple mismanagement or negligent supervision under another exception to the Federal Tort Claims Act....

*Frigard v. United States*, 862 F.2d 201, 203 (9th Cir.1988). The Ninth Circuit, however, took it upon itself to invoke the discretionary function exception as a bar to a negligent supervision tort—a determination this court also has no authority to question. *Frigard*, 862 F.2d at 203. This passage, however, illustrates that the Ninth Circuit characterized plaintiffs' complaint as a tort action. The Claims Court lacks jurisdiction to adjudicate torts.

**5.** This section addresses plaintiffs' other two sets of facts—that the CIA converted customer funds for use in intelligence operations, or that plaintiffs' loss was a consequence of the CIA's decision to create an investment banking firm as a cover.

**6.** In an effort to afford plaintiffs every benefit of the doubt, which is necessary when dealing with a RUSCC 12(b)(4) motion, the court has evaluated every conceivable set of facts under which plaintiffs can claim relief.

Neither reading of plaintiffs' complaint, however, states a claim for just compensation under the Takings Clause. An appropriation of private property for intelligence activities would be outside the lawful authority of the CIA. Further, loss of investments during the normal course of market activity will not, in this case, satisfy the taking element of a just compensation claim.

CIA Conversion of Private Investments

■ Under plaintiffs' second possible scenario, the CIA converted plaintiffs' funds into intelligence revenues. Plaintiffs contend that this alleged conversion constituted a compensable taking under the fifth amendment. This scenario, however, does not state a takings claim. This scenario does not allege lawful CIA actions—a prerequisite for a compensable taking.

Plaintiffs characterize the loss of their investments as a governmental taking for which just compensation is due under the fifth amendment. The Just Compensation Clause provides a remedy when the Government deprives, diminishes, or disturbs an individual's right to use, possess, or dispose of property. *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987); *United States v. Dickinson*, 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). The Government also must have taken the private property for a public purpose. *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *Mt. Vernon–Woodberry Cotton Duck Co. v. Alabama Interstate Power Co.*, 240 U.S. 30, 36 S.Ct. 234, 60 L.Ed. 507 (1916). In other words, the Government must have lawfully used its power in converting private property to public use. *Florida Rock Indus. v. United States*, 791 F.2d 893, 898–99 (Fed.Cir.1986), *cert. denied* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Consequently, the Government official or agency that appropriated private property must have acted within its authority. *Florida Rock*, 791 F.2d at 898–99. An unauthorized or unlawful taking is not compensa-

ble under the fifth amendment, but is a claim sounding in tort. *Catalina Properties, Inc. v. United States*, 143 Ct.Cl. 657, 660, 166 F.Supp. 763 (1959).

The CIA may not undertake, facilitate, or encourage activities that violate United States statutes. Executive Order 12333, which deals with the conduct of intelligence activity, explicitly states that "[n]othing in this Order shall be construed to authorize any activity in violation of the Constitution or statutes of the United States." 3 C.F.R. § 200.213 (1982). This Executive Order's predecessor Executive Order similarly stated that "[n]o agency of the Intelligence Community shall request or otherwise encourage, directly or indirectly, any person, organization, or government agency to undertake activities forbidden by this Order *or by applicable law.*" 3 C.F.R. § 113.129 (1979) (emphasis added).

The CIA would have overstepped its authority if it instructed Rewald to form an investment firm, to represent that the firm would invest customers' money in the market, and then to turn the money over to the CIA for intelligence operations. The CIA would have encouraged and undertaken activities that violate several statutes. According to this scenario, the CIA instructed Rewald to represent falsely that he would invest customers' money. Such false representations constitute securities fraud:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which

operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q (1988).

The CIA also would have encouraged Rewald to violate the investment adviser fraud provisions of the 1934 Securities and Exchange Act:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b–6 (1988). Thus, under this possible reading of the facts, plaintiffs have not alleged lawful Government action. In the absence of a lawful Government action or enterprise, plaintiffs have not alleged a takings claim under the fifth amendment.

Use of Investment Firm as Cover

■ Under plaintiff's third possible scenario for recovery under the Takings Clause of the Constitution, the CIA accepted and invested funds which plaintiffs lost due to natural market fluctuations. This scenario also does not state a compensable takings claim. This alleged set of facts does not satisfy the three-part test for compensable takings set forth by the Supreme Court.

To establish a right to just compensation, plaintiffs must show a "taking" of "property" by the Government. The Supreme Court has reviewed three factors to decide whether governmental action effects a taking: (1) the economic impact of Government action on the property owner; (2) the extent to which Government action interfered with investment-backed expectations; and (3) the character of the governmental invasion of property rights. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S.

211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).[7]

The economic impact of Government acts, the first taking factor, invariably depends on the extent of intrusion on property ownership. This factor also presupposes that the Government intruded on property ownership.

Under plaintiffs' third alleged scenario, however, the CIA did not cause the losses, rather market forces caused the losses. The CIA established an investment house as a cover. The investment house placed plaintiffs' investments in various market securities which produced no revenue. Under this alleged set of facts, the market, not the CIA, took plaintiffs' investments.

Until the 1983 bankruptcy proceeding, plaintiffs had plenary authority to direct the course of their investments. Plaintiffs had full authority to dispose of their Bishop, Baldwin securities by trading them on the market. Plaintiffs could inquire into the value of their investments and direct the firm to sell them at the market price. This evidence suggests that the CIA had little or no economic impact on the lost investments. Until the bankruptcy proceedings, the CIA did nothing to hinder plaintiffs from exercising most rights of property ownership. Indeed, after the 1983 bankruptcy proceedings froze all Bishop, Baldwin assets, the CIA still did not impair plaintiffs' enjoyment of their property. Thus, either the CIA did not take plaintiffs' property or it did not intrude upon plaintiffs' property to a compensable degree.

Plaintiffs respond, however, that the CIA caused the bankruptcy. This argument is circular. The CIA connection with the bankruptcy must have occurred either through some negligent management of the assets or through unlawful CIA conversion of the investments. If the CIA's in-

---

**7.** This three-part test is not easy to apply. The Supreme Court acknowledged that it "quite simply, had been unable to develop any 'set formula' for determining when 'justice and fairness' require" compensation. *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. The Court clarified that the three-part test depends on "essentially ad hoc, factual inquiries." *Id.*

volvement was due to negligence, once again, this court lacks jurisdiction to adjudicate torts. If the CIA's involvement was due to illegal activity, once again, the Takings Clause only provides compensation for damages caused by Government acts in furtherance of a lawful public purpose.

Plaintiffs' retort, however, admits too much. Their agreement traces the economic impact on plaintiffs' investments to the special rights afforded priority creditors under law. Under this set of facts, the bankruptcy laws, not the CIA, took plaintiffs' investments. Normal bankruptcy proceedings do not constitute a taking. *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 246–47 (1983), *aff'd mem.* 765 F.2d 159 (Fed.Cir.), *cert. denied* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985). The Court of Claims explained:

> Plaintiff fails to cite any case, and we believe that none could be cited, holding it a taking by the United States under the fifth amendment for a bankruptcy judge to continue a debtor in possession. The power to enact bankruptcy laws is distinct in the Constitution from the power to take.[8]

*City Development Co. v. United States*, 220 Ct.Cl. 730, 731, 618 F.2d 122 (1979).

In sum, plaintiffs' third scenario does not set forth a scenario satisfying the first "takings" factor. The impact on plaintiffs' investments was either not extensive enough to warrant compensation or was not caused by CIA actions at all.

The second factor for a compensable taking requires evidence of Government interference with investment-backed expectations. In recent cases, the Supreme Court has clarified that investment-backed expectations must be reasonable. *Penn Central*, 438 U.S. at 124–25, 98 S.Ct. at 2659. The facts at issue also show that the CIA's use of Bishop, Baldwin as a cover did not impair plaintiffs' reasonable investment-backed expectations.

Plaintiffs do not allege that they expected a certain return on or complete recovery of their initial investments. All that plaintiffs, or any reasonable investor, could have expected was prudent supervision and handling of their funds. Plaintiffs have not alleged, however, that the mere existence of the cover operations frustrated plaintiffs' expectations by jeopardizing the prudent business practice. In fact, at oral argument, plaintiffs' counsel enumerated a host of factors which could have frustrated plaintiffs' expectations as investors, but did not cite the cover operation itself.[9] Thus, plaintiffs have not even claimed that the CIA's action had an impact on their investment-backed expectations.

Finally, plaintiffs do not allege facts satisfying the third part of the takings test. The character of the CIA's alleged action does not trigger the Takings Clause. Consequential injuries arising from the exercise of Government power do not effect a taking. *Sauer v. City of New York*, 206 U.S. 536, 27 S.Ct. 686, 51 L.Ed. 1176 (1907); *Manigault v. Spring*, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905); *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 551, 20 L.Ed. 287 (1871); *see also, Carruth v. United States*, 224 Ct.Cl. 422, 446, 627 F.2d 1068 (1980); *Mosca v. United States*, 189 Ct.Cl. 283, 289–90, 417 F.2d 1382 (1969), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970). Assuming that the CIA used Bishop, Baldwin solely as a cover, the taking allegedly occurred because the Government created an investment banking firm, the consequence of which was that customers could lose money in the market. Plaintiffs' counsel agreed with this characterization at oral argument. Yet, this claim does not assert that losses directly resulted from the cover operation. While plaintiffs' losses certainly were an incident of the CIA's decision to operate an investment firm as a cover, the losses re-

---

8. Any compensable taking involves a Government intrusion on private property during exercise of a lawful constitutional authority distinct from the Takings Clause. This Court of Claims case, however, underscores that normal bankruptcy proceedings do not effect a taking.

9. Specifically, plaintiffs cited normal downturns in the market, the hiring of managers for the cover who had criminal propensities, and negligent supervision of Bishop, Baldwin.

sulted directly from market fluctuations, not from the intelligence activity itself.

In sum then, plaintiffs alleged no facts that would establish the elements of a takings claim. Under such circumstances, plaintiffs' complaint does not state a claim upon which this court can grant relief.

CONCLUSION

This court permitted plaintiffs to allege every conceivable scenario supporting their claims. Plaintiffs' allegations, however, either posed scenarios over which this court has no jurisdiction or posed scenarios that did not state an actionable claim.

Plaintiffs' complaint sounds in tort. The Claims Court lacks jurisdiction over claims sounding in tort. Plaintiffs complaint also fails to state a takings claim. Consequently, this court directs the Clerk to dismiss plaintiffs' complaint.

No costs.