ULTIMATE SPORTSBAR, INC. Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–160C.

United States Court of Federal Claims.

Jan. 31, 2001.

## OPINION

SMITH, Senior Judge.

## I. INTRODUCTION

This case raises several questions on the interface between property rights and bankruptcy and environmental law. Plaintiff Ultimate Sportsbar, Inc. (USI) leased restaurant premises in a building owned by a bankrupt landlord and was the owner of a possessory interest in the premises under the law of Pennsylvania. Prior to bankruptcy, the landlord was subject of a civil suit instituted by the U.S. Environmental Protection Agency (EPA) to compel cleanup. The plaintiff's interest was extinguished in bankruptcy litigation to which the United States, acting on behalf of the EPA, was a party creditor. Plaintiff brought a Fifth Amendment taking claim asserting that the United States [1], as a litigant in the United States Bankruptcy Court for the Eastern District of Pennsylvania, effected a taking of plaintiff's possessory interest. Plaintiff also asserted that a taking was effected because the EPA drove the landlord, and by extension plaintiff's interest, into bankruptcy proceedings. Finally, plaintiff contended that a judicial taking was effected through a novel and unexpected exercise of power by the Bankruptcy Court. Defendant moved to dismiss this suit pursuant to RCFC 12(b)(4) for failure to state a claim on which relief can be granted.[2] Defendant's first contention is that plaintiff possessed no compensable expectancy or reasonable investment-backed

---

1. References to EPA actions are shorthand for actions styled in the name of the United States on behalf of the EPA.

2. Originally, the government asked that, as an alternative to dismissal, the court enter summary judgment under RFCF 56. Government counsel subsequently withdrew this request.

expectations. Secondly, defendant contends that no regulatory taking occurred because the bankruptcy which resulted in the deprivation was not a direct consequence of the EPA's cleanup enforcement action. Alternatively, the government asserted that during the bankruptcy litigation it did not exercise any sovereign prerogatives, but only the rights generally available to other litigants. Finally, the government contested the judicial taking assertion.

The court heard oral argument on defendant's Motion to Dismiss. Subsequently, the court held a telephone status conference at the request of plaintiff's counsel. He informed the court of his client's instructions to withdraw the argument that the Bankruptcy Court committed a taking through a novel and unexpected exercise of its authority. Thus, the court does not consider this issue.

For the reasons stated below, defendant's Motion to Dismiss is GRANTED.

## II. FACTUAL BACKGROUND

On December 3, 1990, plaintiff USI entered into a written lease agreement with Sugarhouse Realty, Inc. (SRI), regarding a portion of SRI's riverfront real property along North Penn Street and North Delaware Avenue on the west side of the Delaware River in Philadelphia, Pennsylvania, on the site of the former Jack Frost Sugar Refinery. Plaintiff intended to operate an outdoor restaurant and bar, known as the "Bahama Bay" or the "Beach Club," on that property. The leased premises themselves were surrounded by several large, abandoned industrial installations. The entire refinery area was owned by SRI, Sugarhouse II Corporation, and Riverfront Concepts, Inc. (RCI), all related entities controlled by Mr. William Thayer (Sugarhouse Entities). The lease was for a five-year term, beginning May 1, 1991, and allowing for automatic annual renewal. To terminate the lease in its fifth year, SRI was obliged to provide USI a written notice on or before January 1, 1996,

and pay a termination fee of $100,000. SRI could not terminate unless it began "substantial and continuous" construction on certain parts of its property. *See* PX A ¶ 3. It is undisputed that SRI never fulfilled any of these conditions.

On August 10, 1985, well before the signing of the lease, the EPA instituted a civil action against SRI and Mr. Thayer in the U.S. District Court for the Eastern District of Pennsylvania under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9606, and the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2606 and 2616, to compel cleanup of hazardous materials from the surrounding properties in the area owned by the Sugarhouse Entities. The leased property, however, was not a subject of this action because it did not contain any such hazards.[3] In November, 1985, the parties stipulated that the owners would remove all hazardous materials by February, 1986 or incur a penalty of $1,119,750. The stipulation was approved in a consent decree. Due to the owners' failure to adhere to the stipulation, the District Court on May 6, 1991, appointed a receiver for "the limited purpose of liquidating [the Sugarhouse Entities'] assets to the extent necessary to effectuate a cleanup of the property." *United States v. Sugarhouse Realty, Inc.*, 162 B.R. 113, 115 (E.D.Pa.1993) (Mem.). The receiver completed the cleanup by February, 1993 at the cost of $400,000, extracted from the receivership assets.

The assets of Sugarhouse Entities were already encumbered by liens of First Royal Bank of Pennsylvania and First Lehigh Bank prior to the receivership. At the time of the cleanup or shortly thereafter, SRI began falling behind on mortgage payments to Royal Bank. By October 4, 1993, the Sugarhouse Entities initiated bankruptcy proceedings in the same judicial district under Chapter 11 of the Bankruptcy Code.[4] Most of the proceed-

---

**3.** Under the lease, SRI specifically warranted that the leased premises "do not contain either upon them or under them any hazardous chemicals." PX A, ¶ 4.

**4.** It is unclear exactly when the Sugarhouse Entities and Thayer sought bankruptcy protection. *Compare United States v. Sugarhouse Realty, Inc.*, 162 B.R. at 115 ("Sugarhouse and Thayer filed ... on June 11, 1992 and July 27, 1992, respectively.") *and* Pl. Resp. at 6 (all Sugarhouse Enti-

ings in issue took place before the Honorable Stephen Raslavich, United States Bankruptcy Judge.

On November 12, 1993, the District Court, on EPA's motion, reopened the cleanup case and entered judgment against SRI and Mr. Thayer for the penalties incurred for violating the consent decree. *See United States v. Sugarhouse Realty, Inc.*, 162 B.R. 113 (E.D.Pa.1993) (Mem.). The court entered the judgment despite the Bankruptcy Code's automatic stay of proceedings against petitioners, *see* 11 U.S.C. § 362(a)(1), on the grounds that the EPA's claim fell within the regulatory action exemption, *see* 11 U.S.C. § 362(b)(4). This judgment enabled the EPA to participate in the Bankruptcy Court proceedings regarding the Sugarhouse Entities as a major unsecured creditor.

During the bankruptcy proceedings, SRI's property garnered some interest as a potentially attractive location for riverfront or boat casino gambling. The Pennsylvania legislature was deliberating legalization of gambling at the onset of the bankruptcy, though it ultimately decided against it. Several gambling operators such as Donald Trump,

his company, Trump Castle Associates (collectively the Trump Entities), and LHTW ("Let's Hope This Works") Corporation, expressed an interest in purchasing the property out of bankruptcy. The Bankruptcy Court was presented with several reorganization plans regarding sales to the gambling interests.

The EPA submitted the Second Amended Plan of Reorganization (hereinafter the EPA Plan), which contemplated a sale of virtually all of SRI's assets to LHTW Corp. First Lehigh Bank proposed its own plan that mirrored the EPA Plan as it related to the remaining Sugarhouse Entities. *See In re Sugarhouse Realty, Inc.*, 1995 WL 114151, at 4 (Bankr.E.D.Pa.). The EPA and the First Lehigh Plans were contingent upon each other. Both Plans were accompanied by Disclosure Statements. The EPA Plan also contained an Appendix, the Sugarhouse Realty Agreement of Sale. The Plans and related documents all proposed impairment of the USI lease.[5]

The Bankruptcy Court approved the EPA's and First Lehigh's Disclosure Statements on March 21, 1994. A confirmation

---

ties filed on July 27, 1992) *with In re Sugarhouse Realty, Inc.*, 1995 WL 114151, at 1 (Bankr. E.D.Pa.1995) ("[All] Chapter 11 cases were commenced on October 4, 1993.") Likewise, it is unclear whether the bankruptcy actions were instituted due to the appointment of the environmental cleanup receiver, or due to their difficulties in meeting the obligations under the Royal Bank mortgage, or both. However, clarification of this factual ambiguity is unnecessary to the ultimate resolution of the case.

**5.** According to the EPA Plan, "[o]n the Effective Date, the Purchaser, in Accordance with the Asset Purchase Agreement, shall purchase the assets described in the Asset Purchase Agreement, including the Property, free and clear of all liens, encumbrances, security interests and adverse claims," except the secured claim of Royal Bank, for cash. ¶ 5.1 Furthermore, the Plan stated that "[a]ll executory contracts and leases shall be deemed rejected on the Effective Date," EPA Plan ¶ 9.1; *cf.* First Lehigh Plan ¶ 9.1 ("All executory contracts and leases shall be deemed rejected on the Effective Date.") The EPA Disclosure Statement incorporated the lease by reference and noted that "[t]he Plan contains a provision rejecting the Lease. The Ultimate Sports Bar, Inc., filed an unliquidated, unsecure claim against [SRI]." ¶ IV(G). The First Lehigh Statement observed that "[t]he EPA plan in the

Sugarhouse Realty case contains a provision rejecting the Lease. Plan Proponent is unaware of any lease with USI entered into or signed by either Debtor. USI has filed an unliquidated, unsecure claim against RCI." ¶ IV(J).

Under the Agreement of Sale, SRI agreed to sell and LHTW agreed to buy "[a]ll leasehold interests, if any, of Sellers in and to leases for any personal or real property leased by Sellers, except those that have been duly rejected in connection with the Bankruptcy Proceedings." ¶ 2.3. The Agreement also acknowledged that "[t]here are no leases or occupancy agreements affecting the Property or any part thereof, except as set forth in Exhibit C [the USI lease] attached hereto and made part thereof (the "Lease"). . . . No rent due under any Lease has been prepaid or concession made to the tenant or occupant thereunder except as set forth on Exhibit C . . . ," ¶ 7.1.4, "[and that e]xcept for the Lease, there are no agreements in any way affecting the Property," ¶ 7.1.5. The Agreement obligated SRI to deliver to LHTW at closing "[an a]ssignment of the Lease, if the Lease has not been duly rejected pursuant to an order of Court in the Bankruptcy Reorganization." ¶ 12.4. Finally, the Agreement announced that "[t]he lease with Ultimate Sports Bar [sic], Inc. shall be terminated or rejected pursuant to the Bankruptcy Reorganization." ¶ 14.

hearing was eventually scheduled for April 28, 1994. Prior to the hearing, the Trump Entities announced they were no longer interested in the acquisition. All classes of outside stakeholders, including USI, voted to approve the EPA and First Lehigh plans. Subsequently, the court issued Confirmation Orders regarding the estates of all three Sugarhouse Entities. The Order Confirming Second Amended Plan of Reorganization Filed by the United States of America on Behalf of the Environmental Protection Agency provided that "[a]ll executory contracts of the Debtor not previously rejected or assumed pursuant to an Order of the Court shall be deemed rejected pursuant to Section 365 and 1123(b)(2) of the Bankruptcy Code to the extent set forth in, and in accordance with, the terms of, the Plan, ... [and that t]he Debtor is authorized and directed to sell its real property and other assets as set forth in the Plan and the Asset Purchase Agreement, free and clear of liens, claims and encumbrances and adverse interests (including without limitation leasehold interests), on the terms and conditions set forth therein, and to dispose of the proceeds of such sales as set forth therein, and such sales shall be deemed to be transfers under Section 1146(c) of the Bankruptcy Code." ¶ ¶ 8, 9.

LHTW, however, did not close on the property for approximately two years after the entry of the Confirmation Orders. For the first year, the closing was blocked while the Sugarhouse Entities pursued appeals of the Orders. USI continued to remain in physical possession of the bar premises and paid rent into the bankrupt estate, and SRI continued to manage its real estate holdings as a debtor in possession. For the second year after confirmation, the closing was delayed by various objections of LHTW. LHTW lost in the resulting litigation. See

6. Earlier in the bankruptcy process, SRI sued USI as a manager for turnover of rents and premises, termination of the lease, and damages for breach of the lease. On March 8, 1995, the Bankruptcy Court stated: "The Defendant's Lease was rejected under the terms of a plan of reorganization filed by certain creditors of the Debtor and confirmed on April 28, 1994. The

In re Sugarhouse Realty, Inc., 192 B.R. 355 (E.D.Pa.1996).

The Bankruptcy Court held a hearing on March 26, 1996, one day before scheduled closing. At that hearing, LHTW invoked the language of the Plans, accompanying documents, and the SRI Confirmation Order mentioning "rejection" of the lease or "free and clear" sale, and took the position that USI must be evicted before any closing can take place. LHTW argued that these documents destroyed "any adverse interests, which would include possessory rights of any kind, and specifically including a leasehold interest." Tr. of Hr'g at 6 (March 26, 1996).

USI claimed surprise and, together with First Lehigh and the EPA, vigorously opposed the eviction claim. USI advised the Bankruptcy Court that it retained a state-law possessory interest in the leasehold, which was protected by Section 365(h) of the Bankruptcy Code. See Tr. of Hr'g at 12 (March 26, 1996). That interest was allegedly retained even though the contractual rights and responsibilities under the lease were extinguished through the reorganization process. See id. ("[T]he rejection as provided for in the plans, as confirmed in an order ..., is not disputed.").

EPA's view at the time was that LHTW agreed to close with the tenant in possession, regardless of whether the lease becomes terminated during the confirmation process, at closing, or some time thereafter, and moved to compel closing. See Tr. of Hr'g at 5 (March 26, 1996); Mem. in Support of Motion of the United States of America to Compel LHTW Corp. to Purchase Lease, as Required under the Agreement of Sale, at 7 ("Assuming arguendo that the USB [USI] Lease has not been terminated by operation of state law, it appears that USB may remain in possession of its leasehold interest under Section 365(h) of the [Bankruptcy] Code.") LHTW cross-moved, seeking termination of the lease and vacation of the premises.[6]

Defendant, relying on section 365(h)(1), intends to remain in its leasehold throughout the duration of the term." Sugarhouse Realty, Inc. v. Ultimate Sportsbar, Inc. (In re Sugarhouse Realty, Inc.), Ch. 11 Bankr.No. 92–23024SR, Adv. No. 94–0609, slip op. at 2 (Bankr.E.D.Pa. March 8, 1995). SRI's suit was ultimately dismissed, including the lease termination claim. See id.

At the hearing on April 9, 1996, Judge Raslavich ruled from the bench that although the plan documents were ambiguous regarding termination, they were broad, and that USI was estopped from arguing possessory rights under Section 365(h). Tr. of Hr'g at 27–28 (April 9, 1996). The Court again confirmed its ruling at the hearing on April 23, 1996. Finally, on May 8, 1996, Judge Raslavich issued a written Order directing USI to vacate the bar premises on pain of eviction by the U.S. Marshals, announcing that "[o]n April 23, 1996, the Court ruled that the lease between Sugarhouse Realty, Inc. and USI had terminated and that USI and those taking under or through it have no leasehold, possessory or other right or interest in or to any real property of the Debtors."[7] *In re Sugarhouse Realty, Inc.,* Ch. 11 Case Nos. 92–23024, 24533, and 93–24920(SR), ¶ 1 (Order)(Bankr.E.D.Pa. May 8, 1996). Judge Raslavich awarded SRI's property to LHTW free and clear of all interests, "including without limitation rights (if any) under Section 365(h) of the Bankruptcy Code." *Id.* The Third Circuit affirmed *per curiam, see In re Sugarhouse Realty, Inc.,* 118 F.3d 1578 (3d Cir.1997)(Table), and this action followed.

## III. JURISDICTION

This Court has jurisdiction to hear plaintiff's Fifth Amendment claim under the Tucker Act, 28 U.S.C. § 1491(a)(1). This suit is different in kind from the claims adjudicated during the litigation underlying the facts of this case. That litigation resulted in reorganization of the Sugarhouse Entities' holdings and transfer of SRI's real estate, including the site of USI's business, to LHTW Corp. In that process, other courts have conclusively spoken on bankruptcy law matters. This Court is not conducting an appellate review of proceedings in the U.S. Bankruptcy Court, the U.S. District Court, or the U.S. Court of Appeals for the Third Circuit.

Nevertheless, the Bankruptcy Code does provide a number of protections to private property rights, and these protections are relevant to the determination of the constitutional claims. USI directs the Court's attention to the plain language of 11 U.S.C. § 365(h)(1) (1990), which allowed the lessee to retain whatever possessory interests it had under applicable state law even after the reorganization and sale. In fact, this is the provision of law on which USI chiefly relied for protection of its interest in the bankruptcy proceedings. Section 365(h)(1), in effect at the time of the signing of the lease, provided: "[I]f the trustee rejects an unexpired lease of real property under which the debtor is the lessor, ... the lessee ... under such lease ... may treat such lease as terminated by such rejection ... or, in the alternative, *the lessee may remain in possession of the leasehold* ... under any lease the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee ... under the applicable non-bankruptcy law." (emphasis added).

Second, USI was presumably entitled to benefit from protections inherent in the estate sales process even if that process abrogated its 365(h)(1) protections. *See* Tr. of Hr'g at 26 (April 9, 1996)("The conclusion I have drawn is that—LHTW will prevail here and—will successfully assert a right to have the Sports Bar possessory tenancy—extinguished. I—I draw that conclusion based on the recognition that there is some conflict between the ... 365(h), right—and the 363(f) sale."). USI's interest was disposed under "the same type of a sale ... as under [Bankruptcy Code § ] 363(f)." *See id.* at 40. Section 363(f) permits the trustee to sell the estate property "free and clear of any interest in such property of an entity other than

---

(Stipulation and Order) (Bankr.E.D. Pa. Feb 2, 1996).

**7.** Judge Raslavich also announced from the bench that "this lease, because of its terribly inartful drafting, is likely to be—unenforceable under state law.... I doubt strongly that—at the end of the day [USI] will prevail in—in the proposition that the lease goes on forever, unless there's development of the property." Tr. of Hr'g at 26–29 (April 9, 1996). Ultimately, he did not rule on the state law question. *See* Tr. of Hr'g at 10 (April 23, 1996). The government is not asserting that plaintiff had no estate as a matter of state law, and we will construe this question in favor of plaintiff for purposes of this Motion.

the estate" if, among others, "such entity consents ... or such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." In applying Section 363, the bankruptcy courts determine whether the property interests of third parties are adequately protected through consent or compensation. *See* Bankruptcy Reform Act of 1978, S. Rep. 95–595, at 49–57 (1978), *reprinted in* 1978 U.S.C.A.A.N. 5787, 5835–43. "The concept of adequate protection is derived from the fifth amendment protection of property interests as enunciated by the Supreme Court. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935)." *Id.* at 5835. The Bankruptcy Code, however, does not preclude a Tucker Act remedy should its own property rights protections prove inadequate.

Thus, it appears that Congress did not intend to close for plaintiff the door to this Court, but simply wanted USI to litigate in the tribunals authorized to apply the protections of the Bankruptcy Code prior to seeking just compensation under the Fifth Amendment through the Tucker Act. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("The better interpretation, therefore, of the [Federal Insecticide, Fungicide, and Rodenticide Act's] language on forfeiture is to read FIFRA as implementing an exhaustion requirement as a precondition to a Tucker Act claim."). The underlying bankruptcy litigation fulfills this requirement. USI alleges that it possessed a valid interest, and that it neither consented to its deprivation in bankruptcy nor received compensation for its deprivation. This Court's review of the underlying litigation is limited solely to the question of whether that litigation protected plaintiff's property enough to satisfy the dictates of the Fifth Amendment.

## III.  COMPENSABLE INTEREST

The government argues that the case must be dismissed because plaintiff had no compensable expectancy, or reasonable investment-backed expectation, that its possessory interest would not be liquidated during the bankruptcy proceedings. Support for this theory hinges on the fact that federal bankruptcy legislation predated the creation of the interest in USI. This timeline allegedly put plaintiff on notice that additional, and even confiscatory, legislation may be forthcoming, or that bankruptcy law may be applied against it in a confiscatory manner.

Under the Constitution, Congress "shall have Power to ... establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. ART. I, § 8. *But see id.* at § 8 (States are prevented from passing a "Law impairing the Obligation of Contracts.") Yet the analysis does not end here, for "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 55 S.Ct. 854, 79 L.Ed. 1593 (1935) (citing case law regarding the war power and the powers to tax, to regulate commerce, and to exclude aliens); *see Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 247 (1983); Julia Patterson Forrester, *Bankruptcy Takings*, 51 FLA. L. REV. 851 (1999). Thus, the sovereign itself is on notice: government powers must be exercised with due regard to the Bill of Rights, including the Fifth Amendment's Just Compensation Clause.

USI is not contesting whether the Bankruptcy Code's operation properly impaired contractual obligations owed it under the lease by SRI. Rather, USI is seeking compensation for termination of its leasehold estate. In the bankruptcy context, property and contractual rights are not one and the same, as functional logic might teach. *See, e.g. United States v. Security Indus. Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) ("[O]ur cases recognize, as did the common law, that the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral.") USI essentially argues that the distinction between property and contractual rights is not limited to the debtor-creditor relationships, but that Section 365(h) of the Bankruptcy Code recog-

nizes this distinction in lessor-lessee arrangements as well.

Section 365(h) indeed appears to draw a distinction between rejection of leases, ostensibly as contracts, and termination of leases, ostensibly as non-freehold possessory estates. In fact, the government conceded that "there may be a possessory interest that survives if the leasehold is rejected." Tr. of Oral Argument at 5. The correctness of USI's position is confirmed by the Section's legislative history:

> "Subsection (h) protects real property lessees of the debtor if the trustee rejects an unexpired lease under which the debtor is the lessor (or sublessor). The subsection permits the lessee to remain in possession of the leased property or to treat the lease as terminated by the rejection. The balance of the term of the lease referred to in paragraph (1) will include any renewal terms that are enforceable by the tenant, but not renewal terms if the landlord has an option to terminate. *Thus, the tenant will not be deprived of his estate for the term for which he bargained.* If the lessee remains in possession, he may offset the rent reserved under the lease against damages caused by the rejection, but does not have any affirmative rights against the [bankruptcy] estate for any damages after the rejection that result from the rejection."

1978 U.S.C.A.A.N. 5787, 5846 (emphasis added).

The Court must now consider whether the presence of the Bankruptcy Code on the books prior to the vesting of USI's estate rendered that tenant's estate noncompensable, notwithstanding the actual language of the statute and legislative history.

■ Where an alleged taking arises out of a public action that causes economic loss, the courts have struggled with the question by engaging in ad hoc, factual inquires. Three factors have generally been used: economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of government action. *See Kaiser Aetna v. United States*, 444 U.S. 164, 174–75 (1979). This utilitarian framework first originated in an essay by Frank Michel-man, *Property Utility and Fairness: Comments on the Ethical Foundations of 'Just Compensation' Law,* 80 HARV. L. REV. 1165 (1967), and was first utilized in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

The applicability, analytical value, and effect of the framework's reasonable investment-backed expectations factor pose significant challenges for the courts. "The inability to understand the role of reasonable expectations in generating entitlements paves the way for a rapid elimination of all perceived entitlements by simply claiming that the enactment of a single government regulation reasonably creates an expectation that further regulations will follow." Richard A. Epstein, *Lucas v. South Carolina Coastal Council: A Tangled Web of Expectations,* 45 STAN. L. REV. 1369 (1993). This argument is commonly presented by the government, and this case is no exception. Morever, "[t]here is an inherent tendency towards circularity in this synthesis, of course; for if the owner's reasonable expectations are shaped by what courts allow as a proper exercise of governmental authority, property tends to become what courts say it is." *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1034, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (Kennedy, J., concurring in judgment).

■ We conclude here that the reasonable investment-backed expectations factor does not require dismissal of plaintiff's case. First, because of inherent limitations, the reasonable expectations concept is not "a part of every regulatory takings case." *Palm Beach Isles Assoc. v. United States,* 231 F.3d 1354, 1359 (Fed.Cir.2000). The concept is useless where, as in this case, the alleged taking is "categorical," i.e. physical or involves the denial of all economically viable uses of the property. *See id.* at 1363 ("A purchaser who pays a substantial price for a parcel can be assumed to have expectations that the parcel can be used for some lawful purpose. When government seizes the entire estate for government purposes, whether by physical occupation or categorical regulatory taking, it is not necessary to explore

what those expectations might have been.") The eviction of USI from the bar's premises upon the threat of action by the U.S. Marshals is nothing less than a categorical deprivation. In fact, the acts of the United States involve both a regulatory dimension, termination of the interest through operation of the bankruptcy law, as well as a physical dimension, turnover of possession to LHTW Corp. Either way, " 'reasonable investment-backed expectations' are not a proper part of [liability] analysis." *Id.* at 1364.

■ Nor, as the government argues, does a preexistent federal statutory scheme modify USI's expectations regarding possession of its property in any way. "[E]nactment of broad general legislation authorizing a federal agency to engage in future regulatory activity is not the type of government action that alone" can wipe out these expectations. *See Preseault v. United States,* 100 F.3d 1525, 1539 (Fed.Cir.1996) (alleged uncompensable taking of railroad right-of-way by operation of the federal transportation law). The government's position in *Preseault* was strikingly similar to the one advanced here: "These regulatory statutes governing railroad operations, at least the original statute enacted in 1920 authorizing ICC [Interstate Commerce Commission] jurisdiction [over railways], were on the books when the Preseaults began buying the parcels at issue. As a consequence, the Preseaults should have anticipated that at some time in the future the Government might exercise its general regulatory powers in a way that could frustrate the Preseaults' interest in obtaining the land free of the easement upon its abandonment by the railroad." *Id.*

As *Preseault* establishes, takings law imputes to the owner no such anticipation. Because general legislation is ordinarily insufficient to cause a taking, it is also incapable of severing core rights from the corpus that is property. With general legislation, it is impossible to point to any specific time when possession would no longer continue as an integral part of the owner's expectations. "[A]ny property owner who was prescient enough to allege a regulatory taking following the enactment of [the general legislation] . . . in addition to having some doctrinal explaining to do, presumably would have been met by an equally prescient Government with the defenses of absence of ripeness and failure to exhaust administrative remedies." *Id.* at 1538. Neither is there any law which "suggests that the background principles of a state's property law include the sweep of a century of federal regulatory legislation." *Id.* Nor is USI expecting that the government would forego enforcement of laws. It is well-understood that "no one has a property right to violate otherwise valid laws controlling social conduct" which are reasonably enforced. *Id.* There is no evidence that USI committed any violations or was evicted as a consequence of enforcement.

Even if reasonable investment-backed expectations analysis were relevant here, it would not help the government's position. Instead of preempting property rights without compensation, here the federal scheme explicitly assured protection of private property. "This explicit governmental guarantee form[s] the basis of reasonable investment-backed expectation." *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1010, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). As in *Monsanto,* the property interest claimed by USI was the subject of legislative confirmation rather than abrogation. Both the plain language of the relevant statute specifically allowing for a continued physical possession in and out of the bankruptcy proceedings, and the legislative history of the statute clearly created an expectation that physical possession of lease estates by innocent tenants will not be disturbed.

There can be no doubt that USI possessed a property interest the taking of which is compensable under our Constitution. The Court must now turn to the task of determining whether government actions adversely affecting that interest constituted a taking.

## IV. EPA'S CLEANUP AND PLAN SPONSORSHIP ACTIVITIES

Plaintiff asserts that the EPA's participation in the bankruptcy proceedings was regulatory in nature, and thus the EPA's act of sponsorship of the Reorganization Plan which ultimately was found to terminate USI's possessory interest would constitute a

regulatory taking. The government urges dismissal because the Plan was not an exercise in environmental enforcement but merely a proposal to satisfy all outstanding claims against the estate that was submitted for an evenhanded determination by the Bankruptcy Court. Plaintiff's sponsorship argument is not without some appeal, but, upon closer examination of the developments in the bankruptcy proceedings, presents no circumstances supporting a valid takings claim.

As USI correctly points out, the U.S. District Court for the Eastern District of Pennsylvania allowed the EPA to assert its claim for $1,119,750.00 in regulatory fines because of the EPA's persuasive arguments that collection of the fines was a regulatory function. *See United States v. Sugarhouse Realty,* 162 B.R. 113 (1993). EPA sought entry of judgment against SRI and Mr. Thayer for the amount of the fines provided for in the consent decree and defeated SRI's argument that the judgment claim is precluded under an automatic stay protection afforded by 11 U.S.C. § 362(a)(1) to estates in bankruptcy. In light of the important value of the fines to the goals of environmental protection, the District Court found that the entry of judgment is exempt from the stay under 11 U.S.C. § 362(b)(4) as a "commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's ... regulatory power." 162 B.R. at 115.

Even so, entry of the judgment under a regulatory exception says nothing about whether the monetary claim arising out of the judgment was enforced through the exercise of the government's sovereign power or collected through the exercise of generally available creditors' rights, tempered by the Bankruptcy Code's "adequate protection" principle. "The Government concede[d] [before the District Court] that it may not enforce the judgment." *Id.* If the EPA as a creditor and plan sponsor took no actions overriding USI's consent through its regulatory power, no taking through plan sponsorship has occurred.

■ Mere assertion of claims to property in a judicial proceeding which is neither eminent domain nor regulatory in nature is not the kind of government action that is capable of causing a taking within the meaning of the Fifth Amendment. Our predecessor, the Court of Claims, previously recognized this difference between the power "as a sovereign to acquire property from the rightful owner for the public good, ... [and] the right of ultimate ownership" in a takings claim that arose out of a foreclosure suit by the United States on behalf of the Secretary of Housing and Urban Development. *DSI Corp. v. United States,* 228 Ct.Cl. 299, 302, 655 F.2d 1072 (1981) (citing *Pollard v. Hagan,* 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845) and *Kohl v. United States,* 91 U.S. 367, 23 L.Ed. 449 (1875)). *DSI* held that the government's prosecution of its lien claim before a court in an equal contest of ownership did not amount to a taking. By suing for foreclosure, the United States "did not exercise its sovereignty and expropriate private property from the rightful owner, ... [but only] asserted ... that it was entitled to be the rightful owner of the property as the only holder of a valid mortgage on the property." *DSI Corp.,* 228 Ct.Cl. at 302–303, 655 F.2d 1072.

The corresponding distinction between the nature of government actions as a regulating sovereign and a market participant acting on an equal footing with private parties is also observed in the dormant Commerce Clause jurisprudence. A state entity acting as a market participant is not subject to the Constitution's prohibition on regulation of interstate commerce by the states even if the state is in the market to advance public policy purposes. *See Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 809, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) ("Maryland entered the market for the purpose, agreed by all to be commendable as well as legitimate, of protecting the State's environment.")

■ EPA's sponsorship was not a taking, because under the Bankruptcy Code the process for satisfying the claims of creditors once they have presented their claims against the estate does not extend any special considerations to government units. On the contrary, "[b]ankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally." 1978 U.S.C.A.A.N. 5787, 5835. Indeed, the

EPA sought to vindicate a claim as defined by 11 U.S.C. § 101(5), and it was thus a creditor under 11 U.S.C. § 101(10). Any creditor may file the claim, *see* 11 U.S.C. § 501(a), which will be allowed unless another party-in-interest objects, *see* 11 U.S.C. § 502(a). Once the EPA was on the same footing as other stakeholders in the bankruptcy process, its actions were no longer regulatory in nature. The taking was effected, if at all, by some other arm of the United States.

To put it another way, the government no more deprived plaintiff of its property, or "took" it, through sponsorship of the plan than if it bought this property at an open auction for a fair price. It is irrelevant whether the government got into the auction because of its regulatory powers, because only the bidding and the sale would be the proximate cause of the acquisition. As long as the bidding was evenhanded and competitive, and the sale was non-preferential, the purchase price received by the consenting owner who put the property up for the auction would constitute just compensation.

■ Plaintiff also grasps for the sovereignty nexus in the EPA's cleanup litigation, and alleges that the cleanup action ultimately caused its estate to be subjected to bankruptcy proceedings. Yet, the Bankruptcy Court was invoked by the Sugarhouse Entities and not the EPA. Even if plaintiff's logical chain is true in fact, the argument must be rejected because the chain is too long. Consequential, indirect injuries arising out of exercise of sovereign power are not compensable as a taking. *See Adams v. United States,* 20 Cl.Ct. 132, 139 (1990). As the discussion of bankruptcy law and proceedings makes clear, cleanup litigation cannot be the proximate cause of the deprivation.

Thus, the real issue in this case is one of reasonable consent: whether USI knowingly approved the termination of its interest by voting for the Confirmation Plan and then failing to appeal the Confirmation Order. Or, looking at it another way, was it unreasonable for USI to anticipate in light of all the relevant circumstances that the Plan and the Order would not effect such a termination? To resolve this issue, we would have to determine whether the Bankruptcy Court acted in a novel and unexpected manner by issuing the Confirmation Order or by later interpreting the Confirmation Order to be *res judicata* on the continued existence of a possessory interest protected by Section 365(h). In other words, the real issue in this case is whether a judicial taking was effected.

■ Because the judicial taking argument was withdrawn by plaintiff, it is not necessary to decide whether a claim for this type of taking was stated. A judicial taking occurs where a court's decision that does not even "arguably conform[ ] to reasonable expectations" in terms of relevant law of property rights effects a "retroactive transformation of private into public property." *Hughes v. Washington,* 389 U.S. 290, 296, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967)(Stewart, J. concurring); *see generally,* David J. Bederman, *The Curious Resurrection of Custom: Beach Access and Judicial Takings,* 96 CO- LUM. L. REV. 1375, 1433–1455 (1996), *and* Barton H. Thompson, Jr., *Judicial Takings,* 76 VA. L. REV. 1449 (1990). The present decision is in no way intended to preclude such claims from being cognizable in this tribunal in the future. This is especially true when the judicial proceedings at issue involve bankruptcy—an area with a long-standing congressional policy to protect private property from uncompensated deprivations. *Contra Allustiarte v. United States,* 46 Fed. Cl. 713 (2000). The precise contours of this issue are not a part of this case.

## V. CONCLUSION

Defendant's Motion to Dismiss is GRANTED for the reasons discussed above. Each party shall bear its own costs.

IT IS SO ORDERED.