**CENTRAL PINES LAND
COMPANY, et. al.**

v.

**The UNITED STATES**

No. 98–314L.

United States Court of Federal Claims.

Aug. 12, 2004.

A.J. Gray, III, Lake Charles, LA, attorney of record for the plaintiffs. Kim G. Mayhall, Thomas C. McKowen, IV, of counsel.

Brian S. Heslin, Washington, DC, with whom was Assistant Attorney General Thomas L. Sansonetti, for the defendant.

## OPINION

YOCK, Senior Judge.

This two-count takings action is before the Court on two dispositive motions: (1) the Defendant's Partial Motion to Dismiss or in the Alternative Motion for Summary Judgment of Plaintiffs' Amended Complaint, which relates to Count I; and (2) the Defendant's Motion for Judgment on the Pleadings, which relates to Count II. The Court has jurisdiction over the subject matter of this suit under the Tucker Act, 28 U.S.C. § 1491 (2000).

The Plaintiffs' First Amended and Restated Complaint seeks "just compensation" in accordance with the Fifth Amendment for the defendant's alleged takings of oil, gas, and other mineral interests located below the surface of three contiguous parcels of land owned by the United States in Vernon Parish, Louisiana. Am. Compl. at ¶¶ 1–3. In Count I, the plaintiffs claim a permanent taking of their mineral interests below the surface of two of those parcels, which the parties have denoted as "Group A and B." According to the plaintiffs, " 'Group A' and 'Group B' include lands now within the Kisatchie National Forest, a national forest managed by the Forest Service of the United States Department of Agriculture." *Id.* at ¶ 11. In Count II, the plaintiffs claim a "temporary use" taking of their mineral interests in the third parcel of land, which the parties have denoted as "Group C." According to the plaintiffs, "Group C includes land now within Fort Polk, a military facility of the United States Department of Army." *Id.*

For the reasons discussed below, the Court hereby grants the Defendant's Partial Motion to Dismiss or in the Alternative Motion for Summary Judgment of Plaintiffs' Amended Complaint and dismisses the plaintiffs' Group A and B claims asserted in Count I. With respect to Count II, however, the Court hereby denies the Defendant's Motion for Judgment on the Pleadings, which challenges the plaintiffs' Group C claims on statute of limitations grounds.

## Discussion

This case comes before the Court after a lengthy stay during which the plaintiffs litigated a quiet-title action against the United States in the United States District Court for the Western District of Louisiana in order to determine ownership of the Group A, B, and C mineral rights. *See Central Pines Land Co. v. United States,* No. 2:96–2000, slip op. (W.D.La.2000), *aff'd,* 274 F.3d 881 (5th Cir. 2001), *and cert. denied,* 537 U.S. 822, 123 S.Ct. 101, 154 L.Ed.2d 30 (2002). In the prior action, the parties sought a ruling on whether or not the plaintiffs' mineral rights reverted to the United States pursuant to Louisiana's prescription law, under which mineral servitudes expire and revert to the surface owner after ten years of nonuse. *See id.* at 12, 274 F.3d at 884. Granting summary judgment to the United States, the district court held that the plaintiffs' Group A and B mineral rights had prescribed (or reverted) to the United States in 1974, slip op. at 34; the district court had previously granted summary judgment to the plaintiffs on the Group C mineral rights, holding that a change in Louisiana law made these rights imprescriptible. *See id.* at 3, n. 4.

Both parties appealed the adverse rulings, focusing on the piece of legislation that effectuated this change in Louisiana's prescription law. This legislation, known as "Louisiana Act 315 of 1940," renders "imprescriptible" any oil, gas, or other subsurface mineral rights or royalties in land owned by the United States. *Central Pines,* 274 F.3d at 885 (quoting 1940 La. Acts 315). The plaintiffs argued that Act 315 applied both prospectively to the Group C lands (acquired by the United States after 1940) and retroactively to the Group A and B lands (acquired

by the United States before 1940). The United States, in contrast, argued that Act 315 should not apply at all, either retroactively or prospectively.

The Fifth Circuit concluded that the district court properly granted summary judgment on both counts and therefore affirmed the decision. *See Central Pines,* 274 F.3d 881. Rejecting the plaintiffs' argument, the Fifth Circuit held that Act 315 cannot be applied retroactively to render imprescriptible the mineral servitudes underlying lands acquired by the United States before 1940. *See id.* at 889–90. Accordingly, the Fifth Circuit affirmed the district court's finding that the mineral rights under Group A and B—acquired by the United States before 1940—had prescribed to the United States on March 20, 1974, after the ten-year prescriptive period had passed. *See id.* at 895. The Fifth Circuit, however, rejected the position taken by the United States on the Group C mineral rights, holding that Act 315 applied prospectively to render imprescriptible the plaintiffs' mineral interests in the Group C lands. *See id.* at 892. After the Supreme Court denied a writ of certiorari in late 2002, *Central Pines,* 537 U.S. 822, 123 S.Ct. 101, this Court lifted a stay of the present action, which had been in place pending the resolution of the district court case. Shortly after the stay was lifted, the defendant filed the two dispositive motions now before this Court.

While the prior action was factually complex, the district court's findings have greatly narrowed the issues and set the stage for this Court to address the plaintiffs' claims for the takings of their Group A, B, and C mineral rights. The background facts pertinent to the motions now before the Court are straightforward and can be easily summarized. In 1929, Gulf Lumber Company conveyed the mineral rights located under the Group A, B, and C lands—approximately 100,510.77 acres—to S.H. Fullerton. Next, in separate transactions that took place in 1933 and 1936, the United States acquired the surface rights to the Group A and B lands from Gulf, surface rights that were subject to Fullerton's outstanding mineral interests. On April 26, 1937, Fullerton con-

veyed the mineral rights under the Group A and B lands to Wm. T. Burton, the plaintiffs' alleged predecessor-in-interest. On that same date, Burton also acquired the complete title to the Group C lands, obtaining the surface rights from Gulf and the mineral rights from Fullerton. The United States subsequently acquired the surface rights to the Group C lands from Burton through several separate transactions and expropriation proceedings that took place between 1942 and 1981; Burton, however, retained the mineral rights in the Group C lands. Burton's rights were later transferred in 1988 to the individual plaintiffs in mesne conveyances that occurred as a result of a corporate reorganization.

With this background, the Court can now resolve the Defendant's Partial Motion to Dismiss or in the Alternative Motion for Summary Judgment of Plaintiffs' Amended Complaint, which relates to Count I (Group A and B), and the Defendant's Motion for Judgment on the Pleadings, which relates to Count II (Group C). The Court finds that Count I of the plaintiffs' First Amended and Restated Complaint must be dismissed because the defendant did not engage in any action that would constitute a taking of the plaintiffs' Group A and B mineral rights; rather, these rights reverted to the defendant as surface owner by operation of Louisiana prescription law. In addition, the plaintiffs' Group A and B takings claim was not filed within the Court's six-year statute of limitations. While the plaintiffs allege that their Group A and B claim accrued in 1974, they have not offered a compelling justification for the Court to invoke the doctrine of equitable tolling of the statute of limitations. Therefore, the Court dismisses Count I on these two grounds.

On Count II, however, the Court lacks a sufficient factual record to evaluate whether or not the plaintiffs' Group C claims are barred by the statute of limitations. Specifically, the Court lacks sufficient facts to determine if the plaintiffs have asserted any claims related to Group C that allegedly occurred after April 3, 1992, the date six years prior to the filing of this lawsuit. The plaintiffs have conceded that some of the claims

that they have asserted in Count II accrued before April 3, 1992, and are thus untimely. The plaintiffs, however, argue that the continuing claim doctrine entitles them to assert claims under Count II for any partial takings of the Group C lands that accrued after April 3, 1992. The defendant disputes the applicability of the continuing claim doctrine. Neither party, however, has presented a clear and complete record of the facts related to the Group C lands for the period spanning from 1978 to the present, with particular emphasis on the events that occurred after April 3, 1992. Without a complete record of these facts, the Court is in no position to rule upon the application of the continuing claim doctrine to the plaintiffs' Group C claims or to the defendant's statute of limitations argument. Therefore, the Court must deny the Defendant's Motion for Judgment on the Pleadings on Count II.

I. Count I: Alleged Taking of the Plaintiffs' Group A and B Mineral Rights

   A. The defendant did not take the plaintiffs' Group A and B mineral rights when it acquired those rights by prescription after ten years of nonuse by the plaintiffs.

Count I must be dismissed because the plaintiffs have not alleged any facts that, if taken as true, would prove that the defendant engaged in an action that constitutes a compensable Fifth Amendment taking of the plaintiffs' mineral rights in the Group A and B lands. Rather, the plaintiffs concede that the defendant acquired these mineral rights by prescription, following ten years of nonuse by the plaintiffs. This Court's decision on the plaintiffs' Group A and B takings claim follows inexorably from the district court's holding in the prior action: the plaintiffs lost their Group A and B mineral rights by prescription as a result of their own inaction, and the defendant did nothing to take these rights.

The Fifth Amendment's Takings Clause states: "[N]or shall private property be taken for public use without just compensation." U.S. Const. Amend. V. This Court utilizes a two-part analysis in order to determine whether a plaintiff has asserted a valid tak-

ings claim under the Fifth Amendment. First, the Court must determine "whether the plaintiff possesses a valid interest in the property affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'" *Karuk Tribe of California v. Ammon,* 209 F.3d 1366, 1374 (Fed.Cir.2000). Second, if the plaintiff establishes a valid property right, then the Court must determine "whether the governmental action at issue constituted a taking of that 'stick.'" *Id.*

■■■ The parties' briefs have largely focused on the second prong: whether the defendant took any action that constitutes a taking of the plaintiffs' Group A and B mineral rights. A taking occurs only when the Government "exercises its rights as sovereign to acquire property from the rightful owner for the public good." *J & E Salvage Co. v. United States,* 36 Fed.Cl. 192, 195 (1996) (quoting *DSI Corp. v. United States,* 228 Ct.Cl. 299, 302, 655 F.2d 1072, 1074 (1981)). In contrast, the Government is not liable for a taking when it acquires property "in a judicial proceeding [that] is neither eminent domain nor regulatory in nature * * *." *Ultimate Sportsbar, Inc. v. United States,* 48 Fed.Cl. 540, 549 (2001); *accord DSI Corp.,* 228 Ct.Cl. at 302, 655 F.2d at 1074. One rationale for this distinction is to put the Government on equal footing with private parties when it is acting as a market participant rather than as a sovereign. *See Ultimate Sportsbar,* 48 Fed.Cl. at 549. When the Government is acting as a landowner, it is entitled to avail itself of the judicial system in order to clarify or protect its right to title of property in which it owns a stake. *See DSI Corp.,* 228 Ct.Cl. at 302, 655 F.2d at 1074. Any reasonable landowner would defend its property rights in a quiet title action, and the Government cannot be held liable for any taking when it obtains additional property in such an action. *See id.*

■■■ In this case, Count I must be dismissed because the plaintiffs have failed to allege any action taken by the defendant that would amount to a taking of their Group A and B mineral rights. In the prior action, the Fifth Circuit affirmed the district court's ruling that the plaintiffs had lost their mineral rights in the Group A and B lands by prescription on March 20, 1974, after ten years of nonuse. *See Central Pines,* 274 F.3d at 895. The defendant took no action to effectuate this change in ownership—the United States merely asserted its property rights under Louisiana's prescription law. Using the Federal Circuit's metaphoric language in *Karuk,* therefore, the Court finds that the defendant did not engage in any acts that would constitute a taking of the plaintiffs' "stick," their Group A and B mineral interests. 209 F.3d at 1374. Rather, as the court determined in the prior case, the plaintiffs lost their "stick" by operation of law after they failed to make use of their mineral servitude for the ten-year period running from 1964 to 1974.

Because the principles of *res judicata* and collateral estoppel bar the plaintiffs from challenging the district court's interpretation of Louisiana's prescription law in the present action, they take a somewhat different tact before this Court. The plaintiffs argue that "the means used by the United States to effectuate the change in ownership from plaintiffs to itself constituted a taking." Sur–Reply of Pls. to Def.'s Reply in Support of Partial Mot. to Dismiss or in the Alternative Mot. for Summ. J. and Mot. upon the Pleadings ("Pls.' Sur–Reply") at 5. This argument, however creatively framed, does not survive close inspection. The change in ownership was effectuated by operation of law, not by any means used by the defendant. To hold otherwise would circumvent the district court's decision in the prior action.

According to the plaintiffs, however, the requisite governmental action that would constitute a taking is the series of transactions in which the defendant acquired the Group A and B surface rights during the 1930's. The plaintiffs argue that "[b]y authorized action, defendant acquired property, with the intended result of affecting the rights of a third party." Pls.' Sur–Reply at 7. This argument is vague—it has to be— because the plaintiffs did not even own the Group A and B mineral rights at the time the United States acquired the Group A and B surface rights. Nevertheless, the plaintiffs

persist in referring to the defendant's alleged wrongful actions in vague terms, contending that "[b]y its acquisition of one person's property, the United States affected the property rights of another, resulting in the eventual complete termination of such property rights." *Id.* at 7. In a subsequent brief, the plaintiffs accuse the defendant of engaging in a deliberate conspiracy to take their mineral rights by prescription:

> The United States took plaintiffs' mineral rights by surreptitiously causing the law applicable to such rights to change, so that plaintiffs would believe that operations were not necessary to maintain their rights, when such operations were necessary. If the United States had simply let plaintiffs know of its secret intent (which caused federal law to become applicable), plaintiffs could have protected their mineral rights by good faith operations.

Pls.' Supplemental Br. as Per Order of November 12, 2003 ("Pls.' Supplemental Br.") at 12. Thus, instead of challenging the district court's interpretation of Louisiana law in the prior action, the plaintiffs argue that the defendant acted with a "secret intent" to change Louisiana law in order to obtain the plaintiffs' Group A and B mineral rights by prescription.

The plaintiffs' position is untenable. Contrary to the plaintiffs' argument, the "means" by which the defendant acquired the mineral rights in the Group A and B lands was by the court's decision in the prior action in which it applied the prescription rules in effect when the defendant acquired the surface rights from Gulf in 1933 and 1936.[1] *See Central Pines,* 274 F.3d at 884, 894–95. These same prescription rules were in effect when Wm.

T. Burton, the plaintiffs' alleged predecessor-in-interest, acquired the mineral rights under the Group A and B lands from Fullerton in 1937. Thus, the "bundle of property rights" that the plaintiffs acquired in the Group A and B lands included a ten-year prescription rule under which the plaintiffs' mineral rights would revert to the surface owner after ten years of nonuse. *See Karuk,* 209 F.3d at 1374. The plaintiffs' failure to use their property for the ten-year period ending on March 20, 1974, caused the mineral rights to prescribe to the surface owner. The defendant took no action to force this change in ownership.

Finally, the Court rejects the plaintiffs' assertion that the defendant acted with a "secret intent" to acquire the Group A and B mineral rights. A plaintiff will not survive a motion to dismiss if it offers nothing more than conclusory allegations that are unsupported by any specific factual assertions. *See Schickler, TMD U.S.A., Inc. v. United States,* 54 Fed.Cl. 264, 268 (2002). Here, the plaintiffs have offered no factual support for their incredible assertion that the defendant acted with a secret intent to change Louisiana law. Moreover, the plaintiffs' argument defies logic because the defendant actually acquired the surface rights to the Group A and B lands before the plaintiffs' alleged predecessor-in-interest acquired its mineral rights in those lands. Thus, in order to accept the plaintiffs' flawed theory, the Court would have to find that the defendant undertook the necessary actions to effectuate a taking of the plaintiffs' mineral rights even before the plaintiffs had acquired those rights.[2] The plaintiffs' theory has no merit.

---

**1.** The court found these rules to be identical to the current rules in Louisiana's Mineral Code.

**2.** Arguing in the alternative, the defendant has also seized upon the plaintiffs' flawed logic to argue that the plaintiffs lack standing to assert their takings claim on the Group A and B lands. Relying upon the plaintiffs' allegation that their takings claim accrued on March 20, 1974, the defendant argues that the plaintiffs were not the owners of the land at the time of the alleged taking. According to the defendant, the plaintiffs had admitted in the prior lawsuit that they did not acquire their mineral interests from Burton until 1988. Thus, the defendant urges the Court to find that the alleged taking both commenced

before Burton (the plaintiffs' alleged predecessor-in-interest) acquired the mineral rights in 1937 and accrued before the individual plaintiffs acquired their interests in those rights in 1988. In response, the plaintiffs argue that they stand in the shoes of their predecessor-in-interest because they obtained their interest in the mineral rights through a valid transfer when Burton reorganized pursuant to Section 355 of the Internal Revenue Code. Because the Court finds that the plaintiffs cannot under any circumstances assert a takings claim for a property interest that prescribed to the defendant, the Court need not address the parties' theoretical debate over

The plaintiffs have offered no evidence to prove that the defendant engaged in any action that would constitute a compensable taking. Accordingly, Count I must be dismissed.

B. The plaintiffs' takings claim for the Group A and B lands is barred by the statute of limitations.

Even if the plaintiffs' could establish a compensable taking for the Group A and B lands, Count I must still be dismissed because this claim is barred by the statute of limitations. Actions brought before this Court must be filed within six years of the day upon which the cause of action accrued. 28 U.S.C. § 2501 (2000). This six-year statute of limitations is a jurisdictional requirement because it is an express condition on the Government's waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491. *See Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1376–77 (Fed.Cir.1998). Every plaintiff bears the burden of establishing jurisdiction, which includes proving that its initial complaint was timely filed within the statute of limitations. *See id.* at 1377.

The plaintiffs' Group A and B land claims must be dismissed because the plaintiffs concede that Count I is untimely and have failed to persuade this Court to invoke the doctrine of equitable tolling. The plaintiffs' claims accrued more than six years before the plaintiffs filed this action on April 3, 1998. A claim accrues for statute of limitations purposes "when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994). "Therefore, a claim under the Fifth Amendment accrues when that taking action occurs." *Id.* In this case, the plaintiffs allege that their Group A and B claims accrued on March 20, 1974, the date on which the plaintiffs' mineral rights prescribed to the United States after ten years of nonuse. *See* Am. Compl. at ¶ 25. While the defendant argues that these claims accrued much earlier than 1974, the defendant also correctly asserts that the plaintiffs have

no excuse for waiting until April 3, 1998, before filing the present action.

■ In an effort to avoid dismissal on statute of limitations grounds, the plaintiffs argue that two judicially-created exceptions justify tolling the statute of limitations in this case. First, the plaintiffs argue that the alleged taking of their Group A and B mineral rights was inherently unknowable. Second, the plaintiffs also argue that the alleged taking was intentionally concealed by the defendant. As an equitable matter, this Court has discretion to toll the statute of limitations where the facts giving rise to a claim were either inherently unknowable or intentionally concealed at the accrual date. *See, e.g., Catawba Indian Tribe of South Carolina v. United States,* 982 F.2d 1564, 1571 (Fed.Cir.1993) (quoting *Japanese War Notes Claimants Assoc. of the Philippines, Inc. v. United States,* 178 Ct.Cl. 630, 634, 373 F.2d 356, 358–59 (1967)); *accord Entines v. United States,* 39 Fed.Cl. 673, 680 (1997); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 407–08 (1994). The party seeking to invoke either of these judicially-created exceptions to the statute of limitations, however, bears the burden of proving that equitable tolling is justified under the circumstances of the case. *See id.* Because the plaintiffs have failed to carry their burden of proving that either exception is warranted in this case, their takings claim for the Group A and B lands must be dismissed as untimely under the statute of limitations.

1. *The plaintiffs' takings claim for the Group A and B lands was not inherently unknowable.*

The plaintiffs cannot meet their burden of proving that the statute of limitations for their Group A and B takings claim should be tolled on the basis that this claim was inherently unknowable. A plaintiff seeking to invoke this judicially-created exception must show that the alleged injury was inherently unknowable at the accrual date. *See Catawba Indian Tribe,* 982 F.2d at 1571 (quoting *Japanese War Notes Claimants,* 178 Ct.Cl. at 634, 373 F.2d at 358–59); *accord Entines,*

whether or not the plaintiffs have the requisite

standing to assert such a claim.

39 Fed.Cl. at 680; *Catellus*, 31 Fed.Cl. at 407–08. This standard is stringent—it is not enough for a plaintiff to show that its claim was not obvious or would have been difficult or inconvenient to discover at the time of accrual. *See Entines*, 39 Fed.Cl. at 680; *see also Catellus*, 31 Fed.Cl. at 407. Rather, as this Court has observed, "[t]hat which is inherently unknowable is that which is unknowable by its very essence, i.e., its existence at the critical moment simply cannot be ascertained." *Catellus*, 31 Fed.Cl. at 407. To illustrate this point, the Court in *Japanese War Notes Claimants* utilized Professor Williston's example of an inherently unknowable claim: "defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit." 178 Ct.Cl. at 634, 373 F.2d at 359 (citing 1 WILLISTON ON SALES, § 212(a) (Rev. ed.1948)).

█ To determine whether a claim was knowable at the time of accrual, the Court must apply an objective standard. *See Catellus*, 31 Fed.Cl. at 405; *see also Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir. 1995). Under this objective standard, the statute of limitations will be tolled only if a claimant can prove that it did not have a sufficient opportunity to discover the facts giving rise to its claim on the accrual date. *See Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798, 801–02 (1992); *see also Catellus*, 31 Fed.Cl. at 408. Thus, the Court must focus on the claimant's access to the facts rather than the claimant's actual knowledge of the facts giving rise to its claim. *See id; see also Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720–21 (Fed.Cir. 1984).

█ Accordingly, any matter of public record is by definition knowable. *See Entines*, 39 Fed.Cl. at 680–81. A party will be charged with knowing any facts that are discoverable in public records, and ignorance of one's legal rights arising from those facts is not a sufficient excuse to justify tolling the statute of limitations. *See Catawba Indian Tribe*, 982 F.2d at 1571 (quoting *Japanese War Notes Claimants*, 178 Ct.Cl. at 634, 373 F.2d at 358–59); *Menominee Tribe*, 726 F.2d at 720–21. In summary, the statute of limi-

tations will not be tolled where a claimant could have asserted a claim if it had sought advice, launched an inquiry, or otherwise taken steps to discover available information. *See id.*

█ In this case, the plaintiffs' takings claim for the Group A and B lands was not "inherently unknowable" on March 20, 1974, the accrual date alleged in their First Amended and Restated Complaint. By 1974, the plaintiffs knew or should have known that they were in danger of losing their Group A and B mineral rights due to their failure to interrupt the ten-year prescription period. The plaintiffs had access to the land records showing that the United States had acquired the surface rights to the Group A and B lands from the Gulf Lumber Company in separate transactions that took place in 1933 and 1936. Moreover, the plaintiffs are charged with knowledge of their own failure to utilize their mineral servitudes for the ten-year prescriptive period, which, according to the district court, ran from March 20, 1964, to March 20, 1974. Therefore, the plaintiffs knew or should have known that the Group A and B mineral rights would revert to the surface owner on March 20, 1974, as a result of their own inaction.

While the plaintiffs concede that they had knowledge of these facts, they contend that "knowledge of such surface acquisitions, without knowledge that the United States was intending to acquire a federal interest in the potential prescription of the outstanding minerals, is not knowledge of all the relevant facts forming the basis of the government's liability." Pls.' Supplemental Br. at 12. The plaintiffs, however, have offered no authority or evidence to support this contention. In fact, the district court's decision in the prior case directly contradicts the plaintiffs' current contention that the defendant was required to notify them of its intent to obtain the Group A and B mineral rights by prescription. Contrary to the plaintiffs' contention, the district court applied a prescription rule under which ownership of a mineral servitude is extinguished and passes to the surface owner after ten years of nonuse. *See Central Pines*, slip op. at 12–14. The district

court recognized only two circumstances under which prescription would not occur:

■ the prescriptive period can be interrupted when the holder of the mineral servitude engages in good faith operations with the reasonable expectation of discovering and producing minerals in paying quantities. * * *

■ In addition, the prescriptive period may be suspended, or tolled, if an obstacle prevents the owner from using the servitude.

Slip op. at 13–14.[3] Because Louisiana's law of prescription turns on the mineral servitude owner's inaction rather than the surface owner's intent, the Court rejects the plaintiffs' argument that the defendant's purported intent to acquire the Group A and B mineral rights by prescription is relevant to this case. In any event, the plaintiffs' have offered nothing except bare conclusions to support their "secret intent" theory.

Finally, the plaintiffs also contend that their claim was unknowable because they believed that mineral servitudes on federally-owned lands were imprescriptible under Louisiana Act 315 of 1940. To support their contention, the plaintiffs cite *United States v. Nebo Oil Company*, 90 F.Supp. 73 (W.D.La. 1950), *aff'd*, 190 F.2d 1003 (5th Cir.1951), in which the Fifth Circuit upheld the application of Act 315 to transactions through which the United States had acquired land prior to 1940. The plaintiffs' position, however, is legally untenable, and their reliance upon *Nebo Oil* is misplaced. In 1973, the Supreme Court decided *United States v. Little Lake Misere Land Company*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), holding that Louisiana's Act 315 of 1940 does not apply retroactively and, therefore, has no effect on transactions that took place prior to the statute's enactment. *See id.* at 604, 93 S.Ct. 2389. Thus, the plaintiffs had no basis to rely upon Act 315 or the *Nebo Oil* decision after the Supreme Court decided *Little Lake* in 1973. Yet, even though *Little Lake* was decided before the ten-year prescriptive period lapsed in this case, the plaintiffs still

allowed their mineral rights under the Group A and B lands to prescribe to the United States on March 20, 1974.

In conclusion, equitable tolling exists to protect plaintiffs who did not and could not know the facts giving rise to their claim. *See Catawba Indian Tribe*, 982 F.2d at 1572. In this case, it is clear that the plaintiffs had knowledge of the relevant facts but relied upon the erroneous assumption that their mineral interests would be deemed imprescriptible as a matter of law. It is not appropriate to toll the statute of limitations where a plaintiff was ignorant of its legal rights arising from known facts. *See id.; see also Menominee Tribe*, 726 F.2d at 720–21; *Catellus*, 31 Fed.Cl. at 405; *Entines*, 39 Fed.Cl. at 680–81. The plaintiffs' neglect of their legal rights is even more egregious in this case because the *Little Lake* decision corrected their erroneous interpretation of the law prior to March 20, 1974, the date on which the Group A and B mineral rights prescribed to the United States. The plaintiffs could have acted to prevent their mineral servitude from reverting to the United States, but they neglected to act. Instead, they relied upon an erroneous interpretation of the law, which, in turn, caused them to lose their mineral rights while allowing the statute of limitations to expire.

> *2. The defendant did not intentionally conceal any relevant information regarding the Group A and B lands from the plaintiffs.*

According to the plaintiffs, the statute of limitations should also be tolled as a result of the defendant's alleged intentional concealment of material facts regarding the Group A and B lands. While the statute of limitations must be tolled where a defendant intentionally conceals its actions from the plaintiff so that the plaintiff will be unaware that a claim exists, *see Japanese War Notes Claimants*, 178 Ct.Cl. at 634, 373 F.2d at 359, the Court finds no evidence of such behavior by the defendant in this case. The plaintiffs allege that the defendant hid its intent to acquire

---

**3.** The plaintiffs have not challenged the validity of this prescription rule applied by the district court and affirmed by the Fifth Circuit, as they are no doubt aware that collateral estoppel would bar such a challenge.

the Group A and B mineral rights, but they offer no evidence to support their position. Moreover, the plaintiffs' concealment argument is based upon the same flawed premise as its argument that its claim was inherently unknowable: The plaintiffs incorrectly assume that the United States was required to express its intent to acquire the mineral rights under the Group A and B lands. As discussed above, the district court's decision in the prior action contradicts the plaintiffs' position. As stated previously, the plaintiffs' mineral rights were extinguished as a result of their own inaction, not because of any action taken by the defendant. Therefore, the Court finds no reason to toll the statute of limitations on equitable grounds. Because the plaintiffs' Group A and B takings claim was not filed within the statute of limitations, Count I of the First Amended and Restated Complaint must be dismissed.

## II. Count II: Alleged Taking of the Plaintiffs' Group C Mineral Rights

The defendant has also filed a Motion for Judgment on the Pleadings on Count II, the plaintiffs' claim for a temporary taking of their Group C mineral rights. Although the defendant acknowledges that the plaintiffs were adjudged to be the owners of the Group C mineral rights in the prior action, *Central Pines,* No. 2:96–2000, slip op. (W.D.La.2000), *aff'd,* 274 F.3d 881 (5th Cir.2001), and *cert. denied,* 537 U.S. 822, 123 S.Ct. 101, 154 L.Ed.2d 30 (2002), the defendant challenges the timeliness of the plaintiffs' Group C "temporary use" takings claim. Actions brought before this Court must be filed within six years of the day upon which the cause of action accrued. *See* 28 U.S.C. § 2501. The plaintiffs originally filed their Complaint in this Court on April 3, 1998, and then filed their First Amended and Restated Complaint on January 6, 2003. Thus, to be timely under the Court's six-year statute of limitations, the plaintiffs' Group C takings claim must have accrued after April 3, 1992. Unlike Count I, the plaintiffs have not sought to invoke the doctrine of equitable tolling; rather, the plaintiffs have argued that Count II seeks compensation for a continuing taking of their Group C mineral rights that continues to the present. The Court finds that the

factual record in this case has not been sufficiently developed to enable it to decide this issue. Therefore, the defendant's Motion for Judgment on the Pleadings on Count II must be denied.

The defendant argues that Count II involves a single alleged taking related to Group C that accrued no later than March 31, 1978. *See* Def.'s Mot. for J. on the Pleadings at 2, 3. According to the defendant, "[b]etween 1950 and 1978, through a series of condemnation proceedings, the United States instituted a formal mineral moratorium that prevented the owners of the mineral servitude from entering portions of the Group A and B lands and all of the Group C lands." *Id.* at 3. The defendant asserts that "[t]hroughout the pendency of the moratorium, the United States compensated Wm T. Burton Industries (Burton) on a per acre basis for those parts of the servitude that were inaccessible for mineral operations." *Id.* The defendant contends that this moratorium expired on March 31, 1978, when the United States failed to obtain a court order that was necessary for the moratorium to remain in effect. Thus, the defendant concludes that the plaintiffs should have filed this action within six years of the moratorium's expiration:

> If [p]laintiffs wished to assert a claim of a taking based on a "de facto moratorium," all the elements necessary for the accrual of their claim occurred as of March 31, 1978. Accordingly, a complaint for a taking based on those events would have to have been filed by no later than March 31, 1984.

*Id.* at 4. In summary, the defendant contends that all of the plaintiffs' Group C takings claims asserted under Count II are traceable back to this one event, the alleged end of the formal moratorium in 1978.

Throughout their First Amended and Restated Complaint and their briefs, the plaintiffs characterize their Group C claims differently, arguing that the defendant's wrongful behavior began long ago and continues to the present day. The plaintiffs' First Amended and Restated Complaint alleges that the defendant's formal moratorium actually existed

until 1983 and that the defendant has continued to impose restrictions and prohibitions on the plaintiffs' access to and use of their Group C mineral rights up through the present. Am. Compl. at ¶¶ 31–40.

While the plaintiffs' acknowledge that some of their Group C claims are time barred, they argue that a portion of their claims asserted under Count II are timely under the continuing claims doctrine:

> In this case, the conduct of the United States in preventing use of Group C by plaintiffs did not occur once and then cease. * * * [T]he wrongful conduct never ceased; it continues until the present day. Therefore, their suit is timely as to federal actions (the preventions of access) which occurred within six years of suit being filed.

Opp'n of Pls. to Def.'s Partial Mot. to Dismiss or in the Alternative Partial Mot. for Summ. J. of Pls.' Am. Compl. and to Def.'s Mot. for J. on the Pleadings at 10. Thus, under the plaintiffs' theory, they concede that any claims related to events that occurred before April 3, 1992 (six years before the suit was filed), are time barred, but they argue that the continuing claims doctrine entitles them to recover damages for any temporary takings of their Group C mineral rights that accrued in the time period spanning April 3, 1992, to the present. *See id.* at 11. As a policy matter, the plaintiffs assert that the continuing claims doctrine must apply in this case or else the defendant will have "acquire[d] the right to continue its wrongdoing" up through the present and into the future. *Id.*

Thus, the applicability of the continuing claims doctrine will determine whether or not Count II is time barred. The defendant views Count II as one alleged takings claim for Group C that is traceable back to 1978, while the plaintiffs view Count II as involving many separate temporary takings that constitute a continuing claim. At this preliminary stage of the litigation, however, the Court lacks a sufficient factual record to decide Count II.

■■■ "The continuing claims doctrine has been applied when the government owes a continuing duty to the plaintiffs." *Boling v. United States,* 220 F.3d 1365, 1373 (Fed. Cir.2000). Under this theory, each breach gives rise to a separate cause of action, and a plaintiff may bring suit for any breaches that occurred within the statute of limitations period. *See id.* (citing *Hatter v. United States,* 203 F.3d 795, 797–98 (Fed.Cir.2000) (*en banc*)); *see also Mitchell v. United States,* 10 Cl.Ct. 63, 75, *as modified,* 10 Cl.Ct. 787 (1986). While the continuing claims doctrine applies in cases involving a series of separate wrongful actions, it "does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach." *Boling,* 220 F.3d at 1373. Therefore, a continuing claim exists in cases where the defendant owes the plaintiff an ever-present duty, the nonperformance of which would give rise to a series of actionable breaches, *see Mitchell,* 10 Cl.Ct. at 789, but the doctrine will not apply if the plaintiff's claim arises from a "seminal event" that would constitute one cause of action for the purposes of the statute of limitations. *Hatter,* 203 F.3d at 800.

■■■ Our case law offers several examples that further illuminate this distinction between cases involving seminal events and those involving continuing claims. The United States Court of Claims first applied the continuing claims doctrine in a pay case in order to allow a widow to sue for disability payments denied to her late husband within the six-year statute of limitations period. *See Friedman v. United States,* 159 Ct.Cl. 1, 310 F.2d 381 (1963). The court in *Friedman* held that the plaintiff could assert a new claim each time the Government improperly denied her benefits. *See id.,* 159 Ct.Cl. at 7–8, 310 F.2d. at 385. The Federal Circuit applied this same framework in *Hatter* to allow Article III judges to bring a suit for improper withholding of social security taxes from their monthly paychecks for the period that spanned six years prior to the filing of the lawsuit. *See id.,* 203 F.3d at 800.

This Court has also applied the continuing claims doctrine outside of the context of pay cases. In *Mitchell,* a timber sale case, the United States Claims Court held that the

Government's repeated failure to perform its ongoing statutory duty to replant trees located on the Quinault Reservation gave rise to a new cause of action each time the Government failed to replant a tree. *See id.,* 10 Cl.Ct. at 788. The Court noted that "[t]he duty to replant * * * is an ever-present one, rather than one tied to a fixed point in time. Thus, the non-performance of the duty is properly viewed as giving rise to a series of actionable breaches." *Id.* at 789. Similarly, in *Mitchell,* the plaintiffs had another claim in which they alleged that the Bureau of Indian Affairs had sold their timber at inadequate prices. As with the replanting claim, the Court found that each alleged wrongful timber sale gave rise to a new and separate cause of action. *See Mitchell,* 10 Cl.Ct. at 77. Based upon this reasoning, the Court in *Mitchell* permitted the plaintiffs to bring suit for each alleged breach that occurred within six years of the filing of the lawsuit. *See id.*

While the continuing claims doctrine has been applied in cases involving ongoing statutory duties, the Federal Circuit has cautioned this Court against utilizing this approach in cases where a claim is traceable back to a single alleged breach that resulted in a series of deleterious effects. *Boling,* 220 F.3d at 1373. For example, the Federal Circuit refused to apply the continuing claims doctrine to a single alleged taking for erosion caused by a Government waterway. *See id.* at 1374. The Federal Circuit noted that while the erosion took place over time, the taking was caused by "only a single governmental act * * *—allowing the erosion from the waterway to substantially encroach the plaintiffs' property." *Id.* Similarly, in *Fallini,* the Federal Circuit rejected the continuing claims doctrine in a case where the alleged taking was traceable back to Congress' enactment of a single statute. 56 F.3d at 1382–83. The plaintiffs in that case were landowners who asserted a continuing takings claim arising from a piece of legislation that required them to allow wild horses to drink water that was kept on their property. The plaintiffs claimed that a taking occurred each time a horse drank water on their property after the enactment of the statute, a period spanning over twenty years. The Federal Circuit rejected the plaintiffs'

continuing claims argument, holding that the alleged taking occurred when Congress enacted the legislation. *See id.* at 1383. The court reasoned that each new drink was merely a continuing economic burden resulting from this original alleged taking. *See id.*

The Federal Circuit has similarly applied this rationale to bar lawsuits based upon a single breach of contract that occurred outside the statute of limitations but which caused long-term financial damage to the plaintiffs. *See, e.g., Ariadne Fin. Svcs. Pty Ltd. v. United States,* 133 F.3d 874 (Fed.Cir. 1998); *Brown Park Estates–Fairfield Dev. Co. v. United States,* 127 F.3d 1449 (Fed.Cir. 1997). For example, the plaintiffs in *Ariadne,* a Winstar related case, brought breach of contract claims under FIRREA after the Government repudiated their contract by barring them from using supervisory goodwill in partial satisfaction of their minimum regulatory capital requirements for twenty-five years. Although this repudiation allegedly occurred over six years before the plaintiffs filed their lawsuit, the plaintiffs argued that the continuing claim doctrine should allow them to assert claims for the lost use of supervisory goodwill for each year within the statute of limitations. The Federal Circuit rejected the plaintiffs' contention, holding that the Government's alleged repudiation was a breach of contract that occurred at a fixed point in time that was outside the statute of limitations. *See Ariadne,* 133 F.3d at 879. According to the Federal Circuit, the Government's continued refusal to allow the use of supervisory goodwill year after year did not give rise to a separate cause of action each year because this refusal flowed from the Government's original repudiation of the contract. *See id.*

In the present case, the defendant argues that the plaintiffs' Group C land claims arise from a single alleged breach of duty arising from a fixed point in time, March 31, 1978, the date asserted by the defendant as the end of the official moratorium. The defendant likens this case to the physical invasion takings cases, arguing that the subsequent series of alleged unofficial moratoriums, military activities, and other governmental interferences that followed the end of the official

moratorium were all consequences of this event, which occurred at a fixed point in time outside of the statute of limitations. *See* Def.'s Reply in Supp. of Partial Mot. to Dismiss or in the Alternative Partial Mot. for Summ. J. and Mot. for J. on the Pleadings at 10. The plaintiffs counter that the defendant's alleged wrongful conduct did not occur once and then cease. Rather, the plaintiffs argue that "there have been numerous wrongful acts by the defendant preventing plaintiffs' access. * * * Each time the United States prevented plaintiffs' access was an independent and distinct wrong." Pls.' Sur–Reply at 8.

The parties sharply disagree about whether or not the alleged wrongful prevention of access to the Group C lands can be traced back to a single event or a series of separate ones. Unlike the dispute relating to the Group A and B lands, however, the pleadings related to the Group C lands do not provide the Court with a sufficient factual basis on which to grant the Defendant's Motion for Judgment on the Pleadings on Count II. While RCFC 12(c) entitles a party to move for judgment on the pleadings after they have become closed, the Court may grant such a motion only where it is certain that the nonmovant "is entitled to no relief under any state of facts which could be proved in support of his claim." *Gummer v. United States*, 40 Fed.Cl. 812, 814 (1998) (quoting *Branning v. United States*, 215 Ct.Cl. 949, 950, 1977 WL 9606 (1977)). In deciding a motion for judgment on the pleadings, the Court must assume the truth of all of the nonmovant's allegations and grant all reasonable inferences in the nonmovant's favor. *See id.* In this case, the parties' pleadings related to Count II leave the Court with too many unanswered questions to justify a judgment on the pleadings.

The Court is not in a position to determine whether or not the continuing claims doctrine should apply to this case without further development of the facts beyond those contained in the parties' pleadings. As noted above, the plaintiffs have argued that this case involves "numerous wrongful acts by the defendant preventing plaintiffs' access." Pls.' Sur–Reply at 8. The plaintiffs, however,

have offered few details to bolster this assertion. In particular, the plaintiffs have not identified which alleged wrongful acts by the defendant occurred during the relevant time period for statute of limitations purposes: April 3, 1992, to the present. For instance, the plaintiffs' First Amended and Restated Complaint alleges that, "[c]ommencing in 1992, unknown to plaintiffs, the United States Bureau of Land Management granted a series of oil and gas leases purporting to cover portions of the Property." *Id.* at ¶ 17. The plaintiffs, however, do not identify whether or not these allegations relate to the Group C lands. Nor do the plaintiffs provide much detail in their First Amended and Restated Complaint about how their Group C mineral rights were taken. While the plaintiffs allege that the defendant has prevented them from utilizing the surface of the Group C lands for oil and gas exploration after the end of the official moratorium, including by placing insurmountable requirements for access, *see* Am. Compl. at ¶¶ 33–35, the plaintiffs do not identify if these allegations relate to events occurring after April 3, 1992. Thus, the plaintiffs have provided the Court with only vague allegations that do not definitively show any injury arising from the period after April 3, 1992. While the plaintiffs' allegations lack specifics, the current procedural posture of this case requires the Court to assume the truth of the plaintiffs' allegations and grant all reasonable inferences in their favor. Therefore, despite the lack of detail, the Court must infer, for the purposes of this motion, that the plaintiffs have been blocked from accessing their Group C mineral rights.

The defendant, for its part, has also offered little evidence to bolster its contention that the continuing claims doctrine should not apply to this case. The defendant argues that all of the plaintiffs' claims are traceable back to one alleged breach, the end of the official moratorium on March 31, 1978. Like the plaintiffs, however, the defendant has provided the Court with very few facts related to the time period spanning April 3, 1992, to the present. The Court has no record of either the plaintiffs' attempts to access its Group C mineral rights during this time period or the defendant's alleged denials of

access. Without a complete record of events from 1978 to the present, with particular emphasis on April 3, 1992, through the present, the Court is in no position to rule on the effect of the continuing claims doctrine on the statute of limitations. Indeed, the parties' pleadings do not even seem to agree that March 31, 1978, marked the end date of the official moratorium. The plaintiffs' First Amended and Restated Complaint alleges that a moratorium was in place between 1943 and 1983. *See id.* at ¶ 32. Even the defendant has offered conflicting dates, both 1976 and 1978, as the end date of the formal moratorium. *See* Def.'s Mot. for J. on the Pleadings at 3.

In summary, the Defendant's Motion for Judgment on the Pleadings on Count II must be denied because the plaintiffs' Group C takings claims cannot be resolved on the incomplete factual record before the Court. While the parties dispute whether or not the continuing claims doctrine applies in this case, their pleadings have done little to clarify what actions the parties have taken from 1978 through the present. Therefore, the Defendant's Motion for Judgment on the Pleadings cannot be granted. If, after additional discovery, either party decides to file a motion for summary judgment, then it should outline for the Court any attempts that have been made by the plaintiffs to gain access to their Group C mineral rights since 1978 (including during the crucial period after April 3, 1992), and how, if at all, the defendant acted in response.

### CONCLUSION

The Court hereby grants the Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment on Count I and denies the Defendant's Motion for Judgment on the Pleadings on Count II.

Pursuant to RCFC 54(b), the Court finds "no just reason for delay" and directs the Clerk of the Court to enter judgment dismissing Count I of the Plaintiffs' First Amended and Restated Complaint. Each party is to bear its own costs.

The parties are instructed to submit a status report within 30 days of the date of this Opinion that explains how they plan to proceed with Count II.