NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

---

JACKSON-GREENLY FARM, INC., OEHLER FARM, INC., JAMES TAFLINGER TRUST, BENCHMARK FARMS, INC., LAURIE CALDWELL REVOCABLE TRUST, CALDWELL FARMS, LLC, LOIS M. FARRIS FAMILY TRUST, WILLIAM L. GLASS, DBA SISTER ISLAND PARTNERS, INC., ELIZABETH HENDERSON, DBA SISTER ISLAND PARTNERS, INC., TRAVIS HONEY, PATRICIA HONEY, TRAVIS HONEY HOLDINGS, LLC, D & H FARMS, INC., HORSESHOE BAR & GRILL, LLC, KENNETH S. PECORD, SHERRY PECORD, JOHN P. MAGINEL, PAIGE H. MAGINEL, JOHN P. MAGINEL AND PAIGE H. MAGINEL JOINT REVOCABLE TRUST, HENRY M. RENAUD, DOROTHY J. RENAUD, MIKE RENAUD FARMS, LLC, ADAM L. THOMAS, WALTER GRACE FARMS, LLC, BONNIE S. WILLIS, CARL WILLIS AND SONS, INC., DAVID C. WILLIS, LYNN WILLIS, LINDA DILLMAN, JAJ FAMILY, LLC, BASS VENTURES, LLC, JOAN WILKERSON, DONALD R. BILLINGS REVOCABLE TRUST, JASON BILLINGS, LISA CIMMINO, JERRY CLUTTS, BRENT LAY, BART LAY, BILLY LAY, JAKE LAY, JOHN LAY, BILL MASTERS, MASTERS FARMS, INC., JOSH MILLER, SCOTT MILLER, CHERYL MILLER, J & R LAND CO., DARIN JAMES PETTIT AND AUTUMN MARY PETTIT FAMILY REVOCABLE TRUST, RIVER DELTA FARMS, INC., RYAN ROLWING, JAMES SIEBERT, DIANA STEVENS, STEVE WILLIAMS, ALEXANDER COUNTY, ILLINOIS, JOHN GALLAGHER, ANN

**WISSINGER, JOHN P. WISSINGER, JERRY L. SMITH, MARK WILLIS, EDWARD F. MILLER, CARIN KAELIN, MARK MEISENHEIMER, MILLER BROTHERS FARM,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2020-1113

———————————

Appeal from the United States Court of Federal Claims in No. 1:18-cv-01141-EDK, Judge Elaine Kaplan.

———————————

Decided: April 20, 2021

———————————

ADAM MICHAEL RILEY, Flint Law Firm LLC, Edwardsville, IL, for plaintiffs-appellants. Also represented by JENNIFER GELMAN.

ERIKA KRANZ, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by JEFFREY B. CLARK, ERIC GRANT, JOHN LUTHER SMELTZER.

———————————

Before DYK, LINN, and MOORE, *Circuit Judges.*

DYK, *Circuit Judge.*

On August 3, 2018, sixty-two landowners ("Landowners") with property on or near Dogtooth Bend Peninsula in

Alexander County, Illinois, filed a takings claim in the United States Court of Federal Claims ("Claims Court") alleging that the Army Corps of Engineers ("Corps") caused recurrent atypical flooding of their land that constituted a taking. The Claims Court dismissed the action without prejudice, concluding that the Landowners' claims were barred by the six-year statute of limitations governing actions brought under the Tucker Act, 28 U.S.C. § 1491(a)(1). Because Landowners' claims stabilized before August 3, 2012, we *affirm*.

## BACKGROUND

### I

Alexander County, Illinois, is located in the alluvial plain of the Mississippi River. It encompasses several towns, including Olive Branch and Miller City. It also contains the Dogtooth Bend Peninsula, which is bordered on three sides by the Mississippi River. The primary use of this land is agricultural. This land has historically been subjected to periodic destructive flooding as well as milder flooding.

Beginning in the 1800s, the Corps began placing river training structures in the Middle Mississippi River in order to improve its navigability. Examples of such structures include wing dikes, bendway weirs, and chevron dikes. The wing dike is built using wooden pilings or rocks that extend perpendicularly from the riverbank into the river channel in order to redirect flow and sediment. The bendway weir is a fully submerged rock structure used to create a wider and safer navigation channel. Finally, the chevron dike is an arch-shaped structure that is placed within the channel to alter sediment flow. Landowners allege that the Corps' placement of these structures in the River raised the river stage, resulting in a taking of their land by recurrent atypical flooding. In particular, Landowners allege that "newer varieties of river training structures, introduced in the 1990s, had a more profound effect on water surface

elevations than earlier structures." Appellants' Br. 18; *see also* J.A. 43 ("Starting in approximately 1989, the Corps began constructing large numbers of bendway weirs along the Middle Mississippi River.").

## II

Following a severe flood in 1927, remediation efforts were undertaken to prevent or moderate the effects of flooding. The record does not suggest that these efforts attributed the flooding to the government's construction of river training structures. In 1927, the state of Illinois, along with local interests in Alexander County, built the Len Small Levee (the "Levee") along the western edge of the Dogtooth Bend Peninsula to help protect the land from future flooding. In the decades that followed, the Levee was expanded several times until it spanned roughly 19 miles in length. There is no suggestion of federal involvement in building, expanding, or repairing the Levee until a 1943 flood, although the Levee appears to have been damaged by floods in at least 1929, 1931, and 1935.

In 1943, the Levee required complete reconstruction that was financed by the federal government even though the Levee was not federally owned. Since 1943, the Levee has been repeatedly damaged by flooding. The Corps repaired the Levee following severe damage caused by flooding in 1944 and 1947. In 1973, flooding caused "30 breaks and severe crown and slope scour caused by overtopping, and wave wash erosion," and local interests again asked for federal assistance with repairs to the Levee. J.A. 616. The Corps provided the majority of the funds needed to fix the Levee after its analysis showed a 1.10 to 1.0 benefit-cost ratio. This cost benefit analysis reflected the Corps' ability to approve rehabilitation projects for non-Federal flood control works only when the work could be economically justified, a requirement now appearing in 33 C.F.R. § 203.44.

Water burst through the Levee again in July 1993, flooding the Dogtooth Bend Peninsula and "depositing millions of tons of sand." Appellee's Br. 15. Recurrent flooding occurred in September–October 1993, November 1993, and April 1994, damaging even more of the Levee. In September 1993, local interests again asked the Corps to help repair the Levee in a letter explaining that "37,000 acres of prime farmland were flooded and the livelihoods of dozens of farmers and their families [were] lost," resulting in damages of approximately $15 million. J.A. 809. The letter additionally stated that, until the Levee was repaired, "the additional flooding potential ma[de] it almost impossible for the area to regain any semblance of normalcy." J.A. 809. "The federal government—this time via FEMA—provided financial assistance for repair of the levee." Appellee's Br. 16.

The Levee was again breached in 2008, resulting in severe flooding and significant damage to the area around the town of Olive Branch.[1] Then, in May 2011, another significant breach occurred, flooding more than 200 structures with over six feet of water and causing approximately $13 million in damages. Following this flood, 90 percent of the town of Olive Branch signed up for a buyout application to FEMA, which proposed relocating residents of the town away from the floodplain because of the "repeated flood damages including extensive flood damage after levee breaches in the Len Small Levee System during the 1993, 2008 and 2011 floods."[2] J.A. 578. However, the relocation

---

[1]    The record does not indicate whether the Levee required repair after the 2008 flood.

[2]    The government contends that at least three plaintiffs in this case signed up to be relocated. Landowners dispute this assertion. Whether or not some of the Landowners decided to participate in FEMA's relocation plan does not affect our decision.

plan was not implemented, and the Corps again helped repair the Levee.

The parties agree that the six-year statute of limitations would bar any claim that accrued before August 3, 2012, which is six years before Landowners filed their complaint.[3]  The first relevant event thereafter occurred in 2016, when Illinois and Missouri experienced "two months of highest-ever-recorded rainfall" and "a record-breaking flooding event" that broke a mile-long breach in the Levee.  Appellee's Br. 17.  Agricultural lands were covered by millions of tons of sands, and several miles of road were covered by flooding.  The local community again requested that the Corps help repair the levee.  However, the Corps' mandatory cost-benefit analysis determined that the proposed repair project was not eligible for assistance, and the Landowners were so advised on July 21, 2016.  The Levee remained unrepaired and, according to Landowners, multiple floods per year "destroy[ed] all agricultural value of the land."  Appellants' Br. 5.

### III

On August 3, 2018, Landowners filed this action in the Claims Court, alleging that the construction of river training structures caused their property to "become inundated more frequently, at higher elevations, for longer durations, and at unusual times of year."  J.A. 855.  The complaint stated that Landowners' "property has incredibly experienced at least four 100-year floods in the past 25 years" and "seven 25-year floods in the past 25 years."  J.A. 888.

---

[3]    Section 2501 provides in relevant part that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.

The government moved to dismiss the initial complaint, arguing that Landowners' claims were time barred under the six-year statute of limitations provided by 28 U.S.C. § 2501 and that Landowners failed to state a proper takings claim. Rather than responding to the motion to dismiss, Landowners filed an amended complaint that "deleted previous references to the relationship between the river training structures and the floods that occurred in 1993 and 2011." J.A. 11. The complaint no longer contained a discussion of the number of 100-year or 25-year floods experienced in the 25 years before the complaint was filed, instead focusing on the 2016 flood and its aftermath. Additionally, Landowners changed their allegations, asserting that they suffered "a taking by recurrent flooding after the 2016 breach in the Len Small Levee," J.A. 32, rather than "a taking by recurrent flooding from breaches in the Len Small levee and other atypical flooding events," J.A. 858.

The government moved to dismiss the amended complaint, asserting that Landowners' claims were barred by the six-year statute of limitations, that Landowners' "claims sound in tort, not takings law," and that Landowners' claims were improperly premised on government inaction. J.A. 107.

The Claims Court held a hearing on the motion to dismiss and received both oral testimony and documentary material submitted by both parties. The Claims Court determined that Landowners "failed to carry their burden of establishing by preponderant evidence that their claims did not accrue before August 3, 2012, six years before they filed this suit." J.A. 1.

The court found that "[n]inety-one percent of the [river training] structures were in place by 2000." J.A. 9. The court also explained that it "d[id] not understand [Landowners] to be arguing that it was only after 2016 that the number and variety of river training structures in the

[Middle Mississippi River] reached sufficient critical mass to cause atypical flooding in the Dogtooth Bend area." J.A. 15.

The Claims Court explained that it was "undisputed that the Dogtooth Bend area in which [Landowners'] properties are located has been subject to frequent flooding since the nineteenth century. It [wa]s also undisputed that . . . the area was subject to severe flooding more recently in 1973, 1993, 1994, 2008, and 2011 as a result of breaches or failures of the levee." J.A. 13. The Claims Court determined that "[c]ertainly by the time of the 2011 flood, it was obvious that the area was liable to 'intermittent but inevitably recurring overflows' (or breaches) of the levee." J.A. 14.

The Claims Court also emphasized that Landowners were or should have been aware of their theory of liability long before 2012 because academic articles had been written since the mid-1970s alleging that river training structures caused water level rises in the Middle Mississippi River and that this information was "easily available" to the Landowners through "public sources." J.A. 15. The court noted that Landowners' original complaint "attributed the breaches of the levee in 1993 and 2011 to the Corps' use of river training structures" and that Landowners had not disavowed those statements despite removing them from their amended complaint. J.A. 14.

In short, the Claims Court explained that Landowners bore the burden to produce evidence to show that the claim did not accrue before August 3, 2012, and found that the Landowners "knew or should have known before August 3, 2012: 1) that the Corps had by then placed hundreds of river training structures in the [Middle Mississippi River]; and 2) that—assuming the validity of Plaintiffs' theory—those structures were the cause of the floods that had breached or overtopped the levee in previous years." J.A. 14.

The Claims Court therefore dismissed Landowners' complaint.  Landowners appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review dismissal for lack of subject matter jurisdiction de novo.  *Applegate v. United States*, 25 F.3d 1579, 1581 (Fed. Cir. 1994).  "To the extent jurisdictional facts are in dispute, however, the findings of fact are reviewed for clear error."  *Hamlet v. United States*, 872 F.2d 1414, 1416 (Fed. Cir. 1989).

For the Claims Court to have jurisdiction over Landowners' claims, the petition must have been "filed within six years after such claim[s] first accrue[d]."  28 U.S.C. § 2501.  This six-year statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988).

I

We first address whether the Claims Court erred in finding that the majority of the river training structures that allegedly caused the flooding had been placed in the river before August 3, 2012, and that Landowners did not argue that there was a material change in the number of river training structures that would justify claim accrual after that date.

Landowners do not contest that river training structures have been used in the Middle Mississippi River for many decades.  The record shows that the vast majority of river training structures were in place before August 3, 2012, with "[n]inety-one percent of the structures . . . in place by 2000."  J.A 9.  Even the newer varieties of river training structure cited by Landowner (e.g., bendway weirs and chevron dikes) were developed and primarily

constructed in the 1990s.  The record does not demonstrate that there was a recent increase in the construction of river training structures that would justify claim accrual after August 3, 2012.

## II

We next address Landowners' argument that their claims did not stabilize until after August 3, 2012.

A cause of action accrues "when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band*, 855 F.2d at 1577.  "Thus, the key date for accrual purposes is the date on which the plaintiffs' land has been clearly and permanently taken." *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000).  When a taking occurs by a gradual physical process, claim accrual can be determined using the stabilization doctrine, first articulated in *United States v. Dickinson*, 331 U.S. 745 (1947). *Dickinson* involved the permanent flooding of the respondents' lands by construction of the Winfield Dam.  331 U.S. at 746.  The Claims Court awarded respondents compensation for a taking by flooding.  The government appealed, claiming that the statute of limitations governing respondents' claims began to run either when the dam began to impound water in October 1936 or when the respondents' land was partially submerged for the first time in May 1937, both before the six-statute of limitations.  *Id.* at 747. The Supreme Court disagreed, explaining that "[t]he source of the entire claim—the overflow due to rises in the level of the river—is not a single event; it is continuous," and that "there [wa]s nothing in legal doctrine[] to preclude the law from meeting such a process by postponing suit until the situation becomes stabilized," i.e., when "a final account may be struck."  *Id.* at 749.

Under the stabilization doctrine, "the statute of limitations d[oes] not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in

the flooding operation the land had become appropriated for public use." *United States v. Dow*, 357 U.S. 17, 27 (1950). This court has explained that the "touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Boling*, 220 F.3d at 1372. Therefore, "a claim does not accrue until the claimant suffers damage." *Northwest Louisiana Fish & Game Preserve Com'n v. United States*, 446 F.3d 1285, 1291 (Fed. Cir. 2006) (concluding that a takings claim stemming from overgrowth of a water weed, hydrilla, did not accrue until "the hydrilla had grown, *and* had grown to harmful levels, *and* the Corps refused to drain the lake to alleviate the harm caused"). However, the stabilization doctrine does not require that "the process has ceased" or that "the entire extent of the damage is determined." *Boling*, 220 F.3d at 1370–71. Further, even "temporary, government-induced flooding may give rise to a claim for the taking of a flowage easement." *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1359 (Fed. Cir. 2018).

Landowners' amended complaint alleged that since the 2016 breach of the Levee, Landowners have been "vulnerable to the increasingly damaging atypical flooding events brought on by the Corps' construction of [river training structures]" and that "[t]his flooding is now substantial and frequent" and "of an entirely different character than the flooding on the [Mississippi River] in its earlier state." J.A. 56–57. Landowners' amended complaint alleged that "each successive construction in the [Mississippi River] adds to and exacerbates flooding" and that "as sediment gradually accumulates on or around the [river training structures], their effect on [water surface elevations] grows." J.A. 52.

The Claims Court concluded that Landowners' claims "clearly stabilized before August 3, 2012," six years before the filing of their claim. J.A. 15. The Claims Court

explained that "the record show[ed] . . . that recurrent flooding had been 'a reality' for decades in the Dogtooth Bend area before the 2016 event." J.A. 16. The Claims Court additionally found that Landowners' "takings claims accrued before August 3, 2012 because they knew or should have known by that date that their property was subject to inevitable recurrent flooding." J.A. 18. The government submitted evidence that the river stage (for a given river discharge) increased between 1969–1980 and has remained relatively constant since that time. Landowners needed to show that there was a material change in the effect of river training structures during the statutory time period that would justify finding that their claims stabilized after August 3, 2012. This they did not do.

Finally, the Claims Court found that Landowners' "knew or should have known before August 3, 2012 . . . that—assuming the validity of [Landowners'] theory—those structures were the cause of the floods that had breached or overtopped the levee in previous years." J.A. 14. We conclude that the Claims Court's findings of fact were not clearly erroneous and that the Claims Court properly concluded that Landowners' claims stabilized before the 2016 breach of the Levee.

The record plainly supports the Claims Court's finding that Landowners knew or should have known about their theory of liability before August 3, 2012. As the Claims Court explained:

> [T]he theory that river training structures caused water levels to rise on the [Middle Mississippi River] has been the subject of academic discussion since the mid-1970s. Moreover, there was local and national news coverage both before and shortly after the major flood event in 2011 concerning the contribution of river training structures in the [Middle Mississippi River] to the flooding that had occurred in 1993, 2008, and 2011. The theory also

surfaced in congressional testimony and was dis-
cussed in a GAO report that was issued in Decem-
ber 2011.

J.A. 15.   This publicly available information, extending
back many decades and providing detailed discussions
about the alleged impact of river training structures, was
enough to put Landowners on notice about this theory of
liability. *See, e.g., Yankton County v. United States*, 135
Fed. Cl. 620, 630 (2017) (explaining that "data, articles,
and reports" relating to plaintiff's claims "were publicly
available" and that "'[a] party will be charged with knowing
any facts that are discoverable in public records'" (quoting
*Central Pines Land Co. v. United States*, 61 Fed. Cl. 527,
534 (2004))).

We therefore conclude that the Claims Court's findings
were not clearly erroneous and that Landowners have not
demonstrated that their claims stabilized after August 3,
2012.[4]  We affirm the Claims Court's dismissal of Land-
owners' claims for lack of subject matter jurisdiction.

**AFFIRMED**

---

[4]    In their reply brief, Landowners rely on *Applegate*,
25 F.3d 1579, and *Banks v. United States*, 314 F.3d 1304
(Fed. Cir. 2003), to argue that the government's past repair
of the Levee prevented their claims from accruing until the
government declined to repair the Levee following the 2016
breach.  This argument was not sufficiently developed in
the opening brief to properly raise the issue for review. *See*
*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312,
1319–20 (Fed. Cir. 2006) (concluding that an argument was
waived even though "there [we]re various places in its
opening brief where [appellant] alluded" to the relevant ar-
gument because "mere statements of disagreement with
the district court as to the existence of factual disputes do
not amount to a developed argument").

14                                    JACKSON-GREENLY FARM, INC. v. US


COSTS

No costs.